## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TRINI ENCINIAS, as personal representative of the
ESTATE OF ADONUS R. ENCINIAS, deceased,

      Plaintiff,

v.                                          No.

CENTRAL NEW MEXICO CORRECTIONAL
FACILITY, STATE OF NEW MEXICO, NEW MEXICO
CORRECTIONS DEPARTMENT, MHM HEALTH
PROFESSIONALS, INC., CENTURION CORRECTIONAL
HEALTHCARE OF NEW MEXICO, LLC, KEN SMITH,
DR. WENDY PRICE, DAVID SELVAGE, TRACY WHITTET,
KYLE TENNISON, KYLE GONZALES, BEVERLY
WOODBURY, ELIZABETH CHAVEZ, TITO VIDAL,
DR. DIGNA CHRISTINA CRUZ-GROST, JAMES DILLON,
DR. JAVIER VERA, DR. WINIFRED WILLIAMS, LAURIE
ST. JACQUES, ISABELLE DOMINGUEZ, CHRIS MAURER,
DANIELLE PINO AND DAVIDMONTOYA, in their individual capacity,

      Defendants.

## COMPLAINT FOR VIOLATION OF CONTITUTIONAL RIGHTS, NEGLIGENT TRAINING AND SUPERVISION, AND PUNITIVE DAMAGES

COMES NOW, the Plaintiff, Trini Encinias, as Personal Representative of The Estate of Adonus R. Encinias, deceased, by and through her attorneys of record, SANDOVAL FIRM (Richard Sandoval, Esq.), and COLLINS & COLLINS, P.C. (Parrish Collins) and for her cause of action states as follows:

1.      Plaintiff Trini Encinias, (hereinafter referred to as "Plaintiff") is the duly appointed Personal Representative of the Estate of Adonus R. Encinias.

2.      At all times material to this Complaint, the decedent, Adonus R. Encinias, was a resident of the State of New Mexico, incarcerated at the Central New Mexico Correctional

Facility (hereinafter "CNMCF") at or near the time of his death.

3.      Defendants NMCD and CNMCF are entities of the State of New Mexico.

4.      CNMCF is operated by the State of New Mexico, by, under and through the NMCD.

5.      NMCD manages and operates the Central New Mexico Correctional Facility and is considered to be a resident of the State of New Mexico.

6.      Centurion Correctional Healthcare of New Mexico, LLC (hereinafter "Centurion") is contracted to provide medical services to New Mexico Corrections Department (hereinafter "NMCD") inmates by General Services Contract #16-770-1300-0097 (hereinafter "GSC"), including CNMCF inmates, which commenced on June 1, 2016 and continues to the present.

7.      According to the "Health Services Addendum Between MHM Professionals, Inc., and Centurion Healthcare of New Mexico, LLC," MHM Health Professionals, Inc. (hereinafter "MHM") agreed to provide medical personnel to Centurion for purposes of providing medical services to NMCD inmates, including those medical personnel providing medical services at CNMCF.

8.      Upon information and belief, MHM is a Delaware for-profit corporation.

9.      Upon information and belief, MHM is the employer of said medical personnel provided to Centurion for purposes of providing medical services to NMCD inmates.

10.     Defendant Ken Smith was at all times material to this Complaint a natural person employed by the State of New Mexico as the Warden of Central New Mexico Correctional Facility.

11.     Defendant Wendy Price, NMCD Behavioral Health Bureau Chief, was at all time material to this Complaint a natural person employed by the State of New Mexico as the Behavioral

Health Bureau Chief for the New Mexico Department of Corrections.

12.     Defendant David Selvage, P.A., Health Services Administrator, was at all time material to this Complaint a natural person employed by the State of New Mexico as the Health Services Administrator for the New Mexico Department of Corrections.

13.     At all times alleged herein, Defendants Kyle Tennison, Kyle Gonzales, Beverly Woodbury, Elizabeth Chavez,Tito Vidal, were agents and/or employees of Defendants Central New Mexico Correctional Facility and/or New Mexico Corrections Department.

14.      At all times alleged herein, Defendants Tracy Whittet, Dr. Digna Cristina Cruz-Grost, James Dillon, Dr. Javier Vera, Dr. Winifred Williams, Laurie St. Jacques, Danielle Pino and David Montoya were agents and/or employees of Defendants MHM Health Professionals, Inc. and/or Centurion Correctional Healthcare of New Mexico, LLC.

15.      Jurisdiction and venue are proper with this Court pursuant to N.M.S.A. 38-3-1 and  42 U.S.C. Section 1983.

<u>STATEMENT OF FACTS</u>

16.     Adonus Encinias (hereinafter "Mr. Encinias") was raised by his mother, Trini Encinias, in Albuquerque, Mexico.

17.     Mr. Encinias came from a large family which included three brothers and five sisters.

18.     Though he loved his family, Mr. Encinias battled substance abuse disorder and addiction into early adulthood.

19.     At the age of 22 years old, Mr. Encinias pled guilty to charges placing him in the custody and care of the New Mexico Department of Corrections.

20.     In addition to incarceration, The Honorable Benjamin Chavez of the Second Judicial District Court of the State of New Mexico also recommended that Mr. Encinias receive therapeutic treatment for substance abuse while incarcerated.

21.     Upon his incarceration, Mr. Encinias repeatedly pled with prison staff and behavioral health staff to be admitted into the prison's Residential Substance Abuse Program or voluntary IOP (intensive outpatient treatment program), in one instance writing: "I wanna change the way I live my life and the ability to live and maintain living a life clean, healthy and sober…please help me! Please."

22.     CNMCF and Centurion Staff never honored these requests, despite Mr. Encinias's repeated pleas and the Court's recommendation.

23.     Upon his incarceration, Mr. Encinias was taking multiple psychotropic medications for mood disorders, including severe depression.

24.     While incarcerated, Mr. Encinias's medication regimen was adjusted to treat not only severe depression, but also chronic anxiety, seizures, tardive dyskinesia and akathisia, insomnia, hallucinations and psychosis.  These medications, at various periods, included: Haldol, Duloxetine, Seroquel, Benztropine, Keppra, Sertraline, and Hydroxyzine.

25.     Mr. Encinias's onslaught of new mental health symptoms and the resultant pharmacopeia of medications administered to him indicated that Mr. Encinias's mental health was rapidly deteriorating.

26.     On May 2, 2018, Mr. Encinias told behavioral health staff that he was "really depressed and had a lot of emotional issues," including some from past childhood trauma and victimization.

27.     No precautions were taken by behavioral health staff, despite what Mr. Encinias disclosed.

28.     On May 7, 2018, Mr. Encinias wrote a goodbye letter to his mother, telling her how much he loved her and expressing his regret that he could not be with her on Mother's Day.  He then attempted to overdose on medication. This was his first suicide attempt while incarcerated.

29.     By June 2018, Mr. Encinias was being kept in restrictive housing or segregation.

30.     On July 6, 2018 Mr. Encinias expressed to behavioral health staff that his depression was worsening

31.     Mr. Encinias requested that his medications be adjusted.  In response, records indicate: "[Mr. Encinias] was encouraged to submit a mental health request with his specific medication requests and was informed that this provider would copy the request and make sure the psychiatric medical provider would receive it. [Mr. Encinias] was provided with a request form, material on anxiety, and a sheet to help with sleep difficulties."

32.     Mr. Encinias also requested to see a therapist.  Records indicate: "[Mr. Encinias] also was very adamant about receiving weekly and more if possible [sic] counseling so that he could express his feelings. [Mr. Encinias] was informed that RDC [at CNMCF] is a temporary, transitional facility that does not provide long-term therapy; he kept interrupting and stated it was his right to have therapy […] He was informed that he can be provided with printed material on many subjects, including sexual abuse, substance abuse, depression, anxiety […]"

33.     On July 18, 2018, Mr. Encinias reported that his depression was worsening and that he had recently attempted suicide.  Records indicate: "[Mr. Encinias] reported he had attempted suicide on May 7, 2018.  However, no crisis paperwork was found in his file from that date […] For Chrono purposes, this claim is considered unreliable […]"

34.     On August 22, 2018, Mr. Encinias attempted suicide for the second time, this time by cutting his arms.

35.     On September 4, 2018, Mr. Encinias submitted a NMDC Health Services Request Form, stating the nature of his problem in one sentence: "I need to see mental health for depression, I'm almost at a breaking point."

36.     On October 15, 2018, Mr. Encinias met with behavioral health staff.  Records indicate: "I spoke with [Mr. Encinias] and gave him a book on how to better himself.  He requested to be seen once a week.  I explained to him I would see what I could do."

37.     On November 14, 2018, Mr. Encinias was again seen by behavioral health staff. Records indicate: "[Mr. Encinias] disclosed that voices are currently telling him he needs to 'do good, to stay out of trouble' […] Inmate disclosed that he disclosed [sic] this [sic] voices being both male and female but not anyone he knows."

38.     On November 17, 2018, records indicate: "[Mr. Encinias] reported that he wanted to kill himself because the 'holiday was coming up' […] [Mr. Encinias] would not contract for safety during this visit but instead kept making the statement that he wanted to 'kill himself.' [Mr. Encinias] disclosed that he was going to attempt self-harm and will be going to heaven to be with his father."

39.     On November 18, 2018, records indicate: "[Mr. Encinias] appeared to be in tears […] [Mr. Encinias] was unable to identify any coping mechanism that he could use to deal with his thoughts only that he did not wanted [sic] to 'kill himself' and the demon had left his body."

40.     On or about the morning of December 2, 2018, CNMCF staff found Mr. Encinias hanging in his cell.

41.     Records indicate that, "[a]ccording to staff, the hanging appeared to have been coordinated to coincide with custody rounds, but the rounds on that particular day took place a few minutes late, though not so late that the resuscitation was entirely ineffective."

42.     Resuscitation efforts were "ineffective" to the extent Mr. Encinias died as the result of hanging.

43.     The Office of the Medical Investigator listed the cause of death as "hanging" and the manner of death as "suicide."

44.     Another CNMCF inmate housed in segregation had also committed suicide just hours prior.

45.     By December 2, 2018, records indicate Mr. Encinias had endured severe medical problems, including: two (2) myocardial infarctions; pulmonary septic emboli; deep vein thrombi; seizures; gastrointestinal bleeds and polyps; and, Hepatitis C.

46.     Medical problems increase the risk of suicide.

47.     By December 2, 2018, records indicate Mr. Encinias had suffered a traumatic brain injury in transport to the Metro Detention Center, resulting in short term memory loss and mood disruptions.

48.     Traumatic Brain injuries and chronic traumatic encephalopathy increase the risk of suicide.

49.     By December 2, 2018, records indicate Mr. Encinias had substance use disorder and, despite multiple requests, was not receiving treatment.

50.     Substance use disorder, especially when untreated, increases the risk of suicide.

51.     By December 2, 2018, records indicate Mr. Encinias was prescribed multiple psychotropic medications to treat mood disorders.

52.     Mental illness indicates a higher risk of suicide.

53.     By December 2, 2018, records indicate Mr. Encinias had endured trauma as a child and young adult.

54.     Trauma increases the risk of suicide.

55.     By December 2, 2018, records indicate Mr. Encinias had attempted suicide twice since his incarceration.

56.     Previous suicide attempts, especially recent attempts, indicate a marked increase in present suicide risk.

57.     By December 2, 2018, records indicate Mr. Encinias had made multiple requests to see behavioral health staff and psychiatrists to address his hopeless and depressed mood and suicidality.  The requests were rarely, if ever, honored.

58.     Feelings of hopelessness, lack of agency and powerlessness increase the risk of suicide.

59.     By December 2, 2018, records indicate Mr. Encinias had spent the majority of the year he was incarcerated in segregation, and was incarcerated in segregation up until his death.

60.     Dr. Stuart Grassian, a Board-Certified Psychiatrist with extensive experience in evaluating the psychiatric effects of solitary confinement, explained that incarceration in solitary can cause either "severe exacerbation or recurrence of preexisting illness, or the appearance of an acute mental illness in individuals who had previously been free of any such illness." Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J.L. & Pol'y 325, 333 (2006).

61.     Recent research on longtime solitary prisoners has recorded the severe side effects suffered by many, including hallucinations and perception disorders, panic attacks, loss of memory and paranoia amounting to a form of delirium that can often lead to suicide attempts.

62.     Mr. Encinias was already ill by the time he was placed in segregation, and decompensated rapidly from that point onward.

63.     As records indicate, Mr. Encinias's risk of suicide increased throughout his incarceration, yet reasonable measures were not taken by CNMCF, Centurion and/or MHM to address this risk or intervene regarding this disturbing trend and Mr. Encinias's increasing risk of suicide.

64.     Given Mr. Encinias's mental health history, even the brief history gleaned from his incarceration, Centurion and MHM knew or should have known of Mr. Encinias's increased suicide risk, and should have trained its agents and employees to care for patients at chronic risk for suicide, and to make the appropriate recommendations, treatment plans, housing plans and referrals.

65.     Given CNMCF's history of inmates committing suicide at its facilities, and the risks inherent in keeping suicidal inmates in segregation, CNMCF knew or should have known that placing Mr. Encinias in segregation would increase his risk of committing suicide, and should have trained its agents and employees to recognize the suicidal risk factors displayed by Mr. Encinias and intervene in light of those factors.

66.     Neither Centurion nor NMCD were accredited by the American Corrections Association ("ACA") or the National Commission on Correctional Health Care ("NCCHC") at times relevant to this Complaint.

67.     The ACA and NCCHC establish mandatory minimum standards for correctional healthcare.

68.     Failure to maintain accreditation suggests failure to establish and maintain minimum standards in correctional healthcare.

69.     NMCD, the State of New Mexico, Ken Smith, Dr. Wendy Price, and David Selvage failed to enforce critical terms of the GSC essential to the protection of the health and safety of NMCD inmates.

70.     NMCD, the State of New Mexico, Ken Smith, Dr. Wendy Price, and David Selvage failed to obtain ACA and NCCHC medical accreditation for CNMCF.

71.     NMCD, the State of New Mexico, Ken Smith, Dr. Wendy Price, and David Selvage allowed Centurion to operate the medical/behavioral health facilities and provide medical/behavioral health services to CNMCF inmates, including Mr. Encinias, despite the lack of ACA and NCCHC accreditation since the inception of the GSC.

72.     NMCD, the State of New Mexico, Ken Smith, Dr. Wendy Price, and David Selvage failed to hold Centurion to the standards of the ACA or NCCHC.

73.     NMCD, the State of New Mexico, Ken Smith, Dr. Wendy Price, and David Selvage failed to hold Centurion to the standard of care under New Mexico law.

74.     NMCD, the State of New Mexico, Ken Smith, Dr. Wendy Price, and David Selvage failed to establish any standard of care for Centurion's provision of medical and behavioral healthcare for NMCD inmates.

75.     NMCD, the State of New Mexico, Ken Smith, Dr. Wendy Price, David Selvage failed to properly oversee, monitor, supervise and manage Centurion's operation of medical facilities and provision of medical services to CNMCF inmates, including Mr. Encinias.

76.     NMCD, the State of New Mexico, Ken Smith, Dr. Wendy Price, and David Selvage failed to take corrective action against Centurion despite clear knowledge of the negligent and reckless provision of medical and behavioral health care by Centurion.

77.     The State of New Mexico and NMCD have a non-delegable duty to provide for proper, necessary and competent medical/behavioral health care for all inmates in the care of New Mexico Corrections Department (NMCD).

78.     New Mexico Corrections Department is the agency responsible for the management and oversight of NMCD correctional facilities, including CNMCF.

79.     NMCD is responsible, on behalf of the State of New Mexico, for the provision of proper, necessary and competent medical care of NMCD inmates, including those at CNMCF, and was so responsible for such care of Mr. Encinias.

80.     NMCD contracted with Centurion for the provision of medical/behavioral health services to NMCD inmates.

81.     Centurion, by the terms of the GSC, was contracted by NMCD for the purposes of providing medical/behavioral health care to inmates in the New Mexico Department of Corrections prison system, including Mr. Encinias.

82.     The term of the GSC began on June 1, 2016 and continues to the present.

83.     Centurion's contract is based on NMCD's goal of reducing avoidable morbidity and mortality while meeting constitutional standards through six goals:

- Ensuring timely access to healthcare services,

- Establishing a prison medical program addressing the full continuum of healthcare services,

- Recruiting, training, and retaining a professional quality medical and mental health workforce,

- Implementing a quality assurance and continuous improvement program,

- Establishing medical support infrastructure; and,

- Providing necessary clinical, administrative, and housing facilities.

84.     By contract with the State of New Mexico, Centurion is solely responsible for medical and behavioral health care to inmate patients at CNMCF.

85.     The GSC delegation of responsibility to Centurion/MHM for medical care to NMCD inmates does not lessen the duties of the State of New Mexico or NMCD to ensure proper, necessary and competent medical and behavioral health care to NMCD inmates.

86.     NMCD's duty to provide proper, necessary and competent medical and behavioral health care to NMCD remains, despite the assignment of said duties to outside contractors, including Centurion.

87.     The collective behavior of the aforementioned NMCD defendants in conspiracy with Centurion and MHM has led to inadequate suicide prevention and treament for inmates at risk of suicide, including Mr. Encinias. This failure has led to multiple inmate suicides, including two suicides on December 2, 2018.

88.     The collective behavior of the aforementioned NMCD Defendants in conspiracy with Centurion and MHM has led to the routine denial of basic mental healthcare for inmates at risk of suicide, including Mr. Encinias.

89.     The collective behavior of the aforementioned NMCD Defendants in conspiracy with Centurion and MHM has led to the routine denial of basic minimal healthcare to inmates.

90.     The collective behavior of the aforementioned NMCD Defendants in conspiracy with Centurion and MHM has led to the routine denial of basic mental healthcareto inmates.

91.     Centurion psychiatric staff failed to meet with Mr. Encinias in late November 2018 despite his history and known increased risk of suicide.

92.     Mr. Encinias' last psychiatric encounter prior to his suicide was on

November 14, 2018 at SNMCF where he was seen by Dr. Cruz-Grost. The doctor charts that Mr. Encinias reported anxiety and symptoms of Extrapyramidal Syndrome (EPS). This is a drug-induced movement disorder caused by use of certain medications, including antipsychotic drugs. Mr. Encinias was on Haldol, an antipsychotic drug which can cause EPS. If left untreated, EPS can lead to permanent brain damage.

93.     Dr. Cruz-Grost charted that Mr. Encinias was to return to clinic in 14 days. Mr. Encinias was never seen by psychiatry after his transfer to CNMCF on November 19, 2018. This was one of many instances in which Centurion nursing staff failed to complete the required Medical Receiving Screen, which would have revealed that Mr. Encinias was due for a psychiatric appointment by November 28, 2018. Mr. Encinias died by suicide on December 2, 2018.

94.     Upon information and belief, defendants Danielle Pino and/or David Montoya knew that a Medical Receiving Screening was required in order to ensure proper continuation of medical care and that the prisoner's psychological needs were being met.

95.     Despite this knowledge, defendants Danielle Pino and/or David Montoya knowingly or recklessly declined to ensure that Mr. Encinias received this screening.

96.     As a result, Mr. Encinias never received the psychiatric appointment previously ordered or any follow up psychiatric care, his mental health rapidly deteriorated, and he suffered psychotic breaks that led to his suicide.

97.     Danielle Pino and/or David Montoya's conduct severely violated acceptable standards of care. Upon information and belief, there was no justifiable reason for failing to complete Mr. Encinias' Medical Receiving Screening or for the failure to implement follow up psychiatric care.

98.     At the time of Danielle Pino and/or David Montoya's actions, Mr. Encinias' need for additional mental health treatment was obvious from both his medical files and his alarming behaviors, which were clear indicators that he was suffering from persistent and severe mental disturbance. Accordingly, Danielle Pino and/or David Montoya must have known about and consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

99.     Danielle Pino and/or David Montoya also possessed final decision-making authority and responsibility to ensure that CNMCF/Centurion nursing staff completed Mr. Encinias' required NMCD Pre-Lockdown Evaluation Form (#236) prior to placing Mr. Encinias in the Restrictive Housing Units (RHU) on November 21, 2018. This form requires nurses to complete a mental status examination, among other things. However, neither the form nor the mental status examination were completed, and Mr. Encinias died by suicide 12 days after placement in the RHU.

100.    Upon information and belief, Danielle Pino and/or David Montoya knew that a NMCD Pre-Lockdown Evaluation was required in order to ensure that RHU placement was medically safe given the prisoner's mental state and that the prisoner's psychological needs were being met.

101.    Despite this knowledge, Danielle Pino and/or David Montoya knowingly or recklessly declined to ensure that Mr. Encinias received this Pre-Lockdown Evaluation.

102.    As a result, Mr. Encinias never received any follow up psychiatric care, his mental health rapidly deteriorated, and he suffered psychotic breaks that led to his suicide.

103.    Danielle Pino and/or David Montoya's conduct severely violated acceptable standards of care. Upon information and belief, there was no justifiable reason for failing to complete Mr. Encinias' Pre-Lockdown Evaluation Form or for the failure to implement follow up

psychiatric care.

104.    At the time of Danielle Pino and/or David Montoya's actions, Mr. Encinias' need for additional mental health treatment was obvious from both his medical files and his alarming behaviors, which were clear indicators that he was suffering from persistent and severe mental disturbance. Accordingly, Danielle Pino and/or David Montoya must have known about and consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

105.    Centurion nurses failed to medically examine Mr. Encinias and complete a NMCD Pre Lockdown Evaluation (NMCD Form 236) prior to placing him into Restrictive Housing Units ("RHU," solitary confinement). NMCD Form 236 would have required a nurse to do a chart review to determine the number of chronic care clinics Mr. Encinias was enrolled in, determine current medications, take vital signs (blood pressure, temperature, pulse, respiratory rate, weight) and to perform a brief medical examination, neurological screen, and mental status examination.

106.    Mr. Encinias was placed into RHU units 12 times during his incarceration. Centurion nursing staff completed only 3 of 12 required Pre Lockdown medical, neurological, and mental status examinations. It should be noted that Centurion nurses failed to perform the Pre Lockdown Evaluation for Mr. Encinias's final placement in RHU on November 21, 2018. Mr. Encinias died by suicide 12 days after placement in RHU.

107.    Mr. Encinias was placed on therapeutic (suicide) watch on 3 separate occasions in July, August, and November of 2018. Each period on watch is remarkable for multiple failures to follow NMCD policies.

108.    The third suicide watch showed failure by Behavioral Health staff to see Mr. Encinias daily. On November 18, 18 Mr. Encinias was kept on watch despite not having

received a face-to-face evaluation by a clinician. NMCD Policy CD-180109 Behavioral Health Crisis Intervention and Suicide Prevention A.3.a.3 states *"The inmate must be re-assessed by a behavioral health clinician within 24 hours and daily thereafter, including weekends and holidays."* Keeping an inmate on suicide watch without a daily evaluation by a licensed clinician violates the universally accepted principle of least restrictive alternative which requires that a patient's treatment does not subject them to excessive restrictions.

109.   Behavioral Health staff also violated NMCD Policy CD-180109 Behavioral Health Crisis Intervention and Suicide Prevention A.3.c.3, in that clinicians failed to have a face-to-face encounter with Mr. Encinias in the days following his release from suicide watch. The policy states *"inmates who require a Therapeutic Watch will be re-evaluated by the assigned clinician or the Clinical Supervisor no later than three working days after release from Therapeutic Watch."* The required encounter is to be documented on Form CD-180109.1 Crisis Intervention Follow-Up. Behavioral health staff failed to follow this policy on 2 of the 3 documented suicide watches (July and August, 2018).

110.   Behavioral Health staff also violated NMCD Policy CD-180109 Behavioral Health Crisis Intervention and Suicide Prevention A.3.c.3 in that clinicians failed to complete a Clinical Assessment following termination of suicide watch. The policy states *"Such inmates who are not actively engaged in behavioral health treatment will receive a clinical assessment using the Clinical Assessment Form CD-108107.1 at the time of the three day re-evaluation in order to determine the need for further behavioral*

*health treatment or changes in treatment."* Clinicians failed to conduct a Clinical Assessment on 3 of 3 of Mr. Encinias's releases from suicide watch.

111.    The closest that Behavioral Health staff came to following NMCD policy was on November 22, 2018 when Beverly Woodbury, LCSW began to fill out Form CD-108107.1 by typing in Mr. Encinias' name, age, DOB, sex, and race/ethnicity. The rest of the 2-page form is left blank. Despite this, Ms. Woodbury's supervisor Elizabeth Chavez, LPCC signed the incomplete form on November 21, 2018 and again on November 26, 2018. They did attach Form CD-180101.1 NMCD Consent/Refusal for Treatment, on which it is indicated that Mr. Encinias refused to participate in the assessment.

112.    The incomplete form, however, consists largely of room to record the inmate's mental health history, previous suicide watch incidents, psychosocial history, medical history, substance abuse, legal/criminal history, abuse and family history, and the reason that the patient was on the most recent suicide watch. All this information was readily available in Mr. Encinias' chart and should have been filled in on the form. The only section of the Clinical Assessment that could not be filled out in the case of the inmate's refusal to participate was the Mental Status Examination.

113.    This consistent failure of Behavioral Health staff to perform a Clinical Assessment following Mr. Encinias's release from suicide watch is a major violation of NMCD policy and had tragic results. As is noted in the policy language, the Clinical Assessment is done *"in order to determine the need for further behavioral health treatment or changes in treatment."* It provides an opportunity, indeed, <u>a requirement,</u> to do a thorough chart review and to utilize clinical judgment in looking at the larger

picture of how that patient/inmate is functioning in prison. Mr. Encinias was not doing well. He was placed on 3 suicide watches in a five-month period and he was never given any treatment (individual or group counseling) by Behavioral Health staff.

114. Behavioral Health staff consistently ignored NMCD policy, and despite this, documentation completed during the 3 suicide watches was signed by Behavioral Health supervisors who should have known NMCD policies and followed them.

115. Behavioral Health and Centurion staff also violated NMCD Policy CD-180109, Behavioral Health Crisis Intervention and Suicide Prevention, in May of 2018 when security staff intercepted a "Letter Goodbye" from Mr. Encinias to his mother dated 5/7/18. At the time Mr. Encinias was incarcerated at Northeastern New Mexico Correctional Facility (NENMCF) in Clayton, New Mexico.

116. In the letter, Mr. Encinias speaks of depression, shame, feeling badly about himself and he thanks his mother *"for the precious life you and God allowed me to have."* He states *"Tonight is hopefully the night that I get 2 be with Jesus and my dad. I feel lots of pain, lots and lots of it. I took 15 of my heart/blood pressure meds so that way I can not be in physical pain. I know you guys may need me and this may be selfish on my behalf but I think life will be less painful for me. Don't cry or feel sad because of this. Tell the kids not to either don't let this suicide dictate your guys future because its what I have wanted and its gonna keep me pain free."* He asks that his remains be buried and not cremated. He states *"Being raped as a kid, seeing/knowing my dads been dead, losing lots and lots of people and becoming very medically ill. Honestly being sick with heart problems, cancer, high blood pressure, memory loss, chronic seizures, and multiple head injuries has caused me so much emotional pain and is the main thing that saddens me."*

117.    Despite this very clear 2-page suicide letter, Mr. Encinias was not placed on a suicide watch following staff interception of the letter. A Documentation Note (NMCD Form CD-180102.1) dated May 14, 2018 at 2:20 p.m. states *"Warden Brown contacted mental health with information that a letter from Inmate Adonus Encinias to his mother had been intercepted due to references to suicide. The letter was entitled "Letter Goodbye" and dated 5/7/18. It contained a plan that Mr. Encinias was attempting to kill himself by overdosing on medication and that he had already taken "15 of my heart/blood pressure meds. Warden Brown confirmed he had called and relayed this information to Medical Director/HSA (Health Services Administrator) Martinez."* The writer of this note (there is no signature but other notes adjacent to it suggest the author is H. Wells, LMSW) does state that he met with Mr. Encinias "in medical".

118.    Mr. Encinias was not placed on suicide watch despite interception of a letter clearly showing that he was suicidal and had taken multiple doses of a prescribed medication. This May 14, 2018 Documentation Note goes on to state that the overdose was *"in fact, had someone else's "KOP's" (keep on persons) in his cell which were there when he arrived. This was confirmed and the KOP medications were taken from his cell by Warden Vigil and given to HSA Martinez."*

119.    This not only verifies the overdose occurred but reveals that security staff had placed Mr. Encinias in a cell that contained a previous inmate's prescribed medications. This entire incident violates multiple security, Behavioral Health and Medical policies. The note suggests that Mr. Encinias was placed in medical segregation, which is not a replacement for suicide watch. Even more troubling is a section of the Mental Health file named Documentation Notes which has a May 2, 2018  note that Mr. Encinias *"was referred to*

*Ms. Vital, who met with him and documented the encounter above. Later it was indicated that it may be Albert Jaramillo #73880 that was victimized him sexually as a child."* This note was written by H. Wells, LMSW. In other words, Mr. Encinias was housed in the same facility as his possible abuser.

120.    Further chart review revealed an Incident Report/Crisis Intervention (NMCD Form CD-180109.1) authored by "K. Hughes, Psy. Assoc." This form, dated May 25, 2018 at 5:20 p.m. states *"Inmate reported PREA"* and describes the presenting problem as *"Inmate was sexually assaulted at NENMCF and felt safe enough to make his initial report to caseworker Angel Salazar. CW Salazar made proper notifications and BH was requested."* This form was filled out at CNMCF RHU. This sequence of events raises the possibility that Mr. Encinias was sexually assaulted at NENMCF prior to overdosing on medications belonging to another inmate.

121.    A review of Mr. Encinias' mental health chart reveals that other than 3 placements into suicide watch, the behavioral health staff at CNMCF did not provide any form of mental health treatment to Mr. Encinias.

122.    Behavioral health staff, which consist of licensed counselors (LMHC and LPCC) and social workers (LMSW, LCSW) are located at all prisons in the NMCD system and are under the direction of an on-site Behavioral Health Manager. Behavioral health staff are much more numerous than the psychiatry staff, as generally a prison has only one psychiatrist, and that position is usually part-time, telehealth, or both.

123.    Most prisons in NMCD have 3 to 5 behavioral health staff. CNMCF, where Mr. Encinias spent much of his time has many more behavioral health staff than the 3 to 5 typical at other prisons. Despite this richer staffing pattern, and Mr. Encinias' multiple

psychiatric diagnoses, behavioral health staff did nothing but conduct screens at intake to their prison (Facility Transfer File Review and Mental Status Examination), conduct required Restrictive Housing Inmate Mental Health Examinations when Mr. Encinias was placed into solitary confinement, and place Mr. Encinias on suicide watch on 3 occasions (while failing to place him on watch after an overdose on another inmate's medications and a 2-page suicide note).

124.    The pattern described above is a violation of NMCD CD-180108 Treatment and Program Services. According to section B.a.a.1 of this policy, *"Inmates who have been discharged from MHTC, APA, Women's Therapeutic Behavioral Health Unit, or seriously mentally ill inmates who are unable to function in general population, and victims of sexual assault. Inmates in these categories will be provided a clinical assessment and treatment plan. A clinical session will be conducted each week for no less than four consecutive weeks. At that time, a clinical determination will be made regarding session frequency."*

125.    Mr. Encinias had ample evidence of serious mental illness with multiple psychiatric diagnoses made as early as March 6, 2018 when he was seen and evaluated by a Centurion psychiatrist at CNMCF RDC. He was continuously on multiple psychiatric medications from that date onward. The evidence was he was unable to function in the general population was striking and includes a 2-page suicide note and an attempted suicide by overdose on May 7, 2018 and 3 suicide watches in July, August and November 2018.

126.    In addition, on May 25, 2018 Mr. Encinias reported that he had been sexually assaulted during his stay at NENMCF. Despite compelling evidence that Mr. Encinias was

unable to function in the general population and reported being a victim of a sexual assault, he was never provided with the clinical assessment and treatment plan required by the policy referenced above.

127.    The CNMCF behavioral staff supervisor possessed final decision-making authority and responsibility to ensure that CNMCF/Centurion behavioral health staff followed NMCD policies regarding Behavioral Health Crisis Intervention and Suicide Prevention during July through November 2018 when Mr. Encinias was placed on therapeutic (suicide) watch.

128.    Per NMCD policy, Mr. Encinias was required to have been assessed by a behavioral health clinician daily while on suicide watch, including weekends and holidays. During this time period, Mr. Encinias was not evaluated daily by a licensed behavioral health staff member in violation of NMCD policy and in the critical months leading up to his suicide.

129.    Per NMCD policy, Mr. Encinias was also required to have been evaluated by the assigned clinician or clinical supervisor no later than three working days after his release from suicide watch to ensure that he was no longer suicidal and determine the need for further behavioral health treatment. However, Mr. Encinias was never evaluated after his July, August, and November 2018 transitions out of suicide watch.

130.    Upon information and belief, the CNMCF behavioral staff supervisor knew that NMCD policies required Mr. Encinias to be assessed by a behavioral health clinician daily and be assessed by a clinical or clinical supervisor within three working days of his release from suicide watch in order to ensure the physical and mental safety of Mr. Encinias and that his psychological needs were being met.

131.    Despite this knowledge, the CNMCF behavioral staff supervisor knowingly or recklessly declined to ensure that Mr. Encinias received these assessments.

132.    As a result, Mr. Encinias did not receive adequate follow up psychiatric care, his mental health rapidly deteriorated, and he suffered psychotic breaks that led to his suicide.

133.    The CNMCF behavioral staff supervisor's conduct severely violated acceptable standards of care. Upon information and belief, there was no justifiable reason for failing to ensure that Mr. Encinias received these assessments.

134.    At the time of the CNMCF behavioral staff supervisor's actions, Mr. Encinias' need for additional mental health treatment was obvious from both his medical files and his alarming behaviors, which were clear indicators that he was suffering from persistent and severe mental disturbance. Accordingly, the CNMCF behavioral staff supervisor must have known about and consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

135.    The NENMCF behavioral staff supervisor possessed final decision-making authority and responsibility to ensure that Centurion behavioral health staff appropriately evaluated Mr. Encinias regarding whether he should have been placed on suicide watch in May 2018 while housed at NENMCF after NMCD intercepted a goodbye letter from Mr. Encinias to his mother dated May 7, 2018, the same day as his first attempted suicide. Despite the very clear 2-page suicide letter, Mr. Encinias was not placed on suicide watch after being taken to the medical unit around this time.

136.    Upon information and belief, the NENMCF behavioral health staff supervisor knew that Mr. Encinias should have been placed on suicide watch in May 2018 in order to ensure his physical and mental safety and that his psychological needs were being met.

137.    Despite this knowledge, the NENMCF behavioral staff supervisor knowingly or recklessly declined to ensure that Mr. Encinias was placed on suicide watch.

138.    As a result, Mr. Encinias did not receive adequate follow up psychiatric care, his

mental health rapidly deteriorated, and he suffered psychotic breaks that led to his suicide.

139.    The NENMCF behavioral staff supervisor's conduct severely violated acceptable standards of care. Upon information and belief, there was no justifiable reason for failing to ensure that Mr. Encinias was placed on suicide watch.

140.    At the time of the NENMCF behavioral staff supervisor's actions, Mr. Encinias' need for additional mental health treatment was obvious from both his medical files and his alarming behaviors, which were clear indicators that he was suffering from persistent and severe mental disturbance. Accordingly, the NENMCF behavioral staff supervisor must have known about and consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

141.    The mental health supervisor possessed final decision-making authority and responsibility to ensure that appropriate mental health treatment was provided to Mr. Encinias while he was housed at CNMCF in the months leading up to his suicide, particularly in the months of July through November 2018, when Mr. Encinias was placed on suicide watch three times yet provided no additional form of mental health treatment.

142.    NMCD policy states that prisoners fitting Mr. Encinias' description must be given a clinical assessment and treatment plan, including weekly clinical sessions for at least a month. However, Mr. Encinias was never provided with an assessment or treatment plan in the months leading up to his suicide, in clear violation of NMCD policy.

143.    Upon information and belief, the mental health supervisor knew that Mr. Encinias should have received this assessment and treatment plan in order to ensure his physical and mental safety and that his psychological needs were being met.

144.    Despite this knowledge, the mental health supervisor knowingly or recklessly declined to ensure that Mr. Encinias was provided with this assessment and treatment plan.

145.    As a result, Mr. Encinias did not receive adequate psychiatric care, his mental
health rapidly deteriorated, and he suffered psychotic breaks that led to his suicide.

146.    The mental health supervisor's conduct severely violated acceptable standards of
care. Upon information and belief, there was no justifiable reason for failing to ensure that Mr.
Encinias received this assessment and treatment plan.

147.    At the time of the mental health supervisor's actions, Mr. Encinias' need for
additional mental health treatment was obvious from both his medical files and his alarming
behaviors, which were clear indicators that he was suffering from persistent and severe mental
disturbance. Accordingly, the mental health supervisor/lead must have known about and
consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

148.    The mental health supervisor also possessed final decision-making authority and
responsibility to ensure that Mr. Encinias was provided with psychoeducational therapy after his
February 21, 2018 intake based on (1) a prison counselor's recommendation that Mr. Encinias
receive psychoeducational therapy, and (2) his clear demonstration of psychological deterioration
with suicidal ideation. Mr. Encinias never received any such therapy and committed suicide shortly
thereafter as a result.

149.    Upon information and belief, the mental health supervisor knew that Mr. Encinias
should have been provided with psychoeducational therapy after his February 21, 2018 in order to
ensure his physical and mental safety and that his psychological needs were being met.

150.    Despite this knowledge, the mental health supervisor knowingly or recklessly
declined to ensure that Mr. Encinias was provided with psychoeducational therapy at this time or
any time thereafter prior to his suicide.

151.    As a result, Mr. Encinias did not receive adequate psychiatric care, his mental

health rapidly deteriorated as evidenced by months of increasingly alarming and concerning behavior, and he suffered psychotic breaks that led to his suicide.

152.    The mental health supervisor's conduct severely violated acceptable standards of care. Upon information and belief, there was no justifiable reason for failing to ensure that Mr. Encinias was provided with psychoeducational therapy.

153.    At the time of the mental health supervisor's actions, Mr. Encinias' need for additional mental health treatment was obvious from both his medical files and his alarming behaviors, which were clear indicators that he was suffering from persistent and severe mental disturbance. Accordingly, the mental health supervisor must have known about and consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

154.    Finally, the mental health supervisor possessed final decision-making authority and responsibility to ensure that Mr. Encinias' 12 RHU Mental Status Examinations between April 6, 2018 and November 21, 2018 were completed properly and with proper documentation, including the Pre Lockdown Evaluations, 75% of which were missing in Mr. Encinias' case.

155.    Upon information and belief,  the mental health supervisor knew the proper procedures for conducting and documenting RHU Mental Status Examinations and knew that Mr. Encinias should have been provided with proper examinations in order to ensure his physical and mental safety and that his psychological needs were being met.

156.    Despite this knowledge, the mental health supervisor knowingly or recklessly declined to ensure that Mr. Encinias received proper RHU Mental Health Examinations during this time period.

157.    As a result, Mr. Encinias did not receive adequate psychiatric care, his mental health rapidly deteriorated, and he suffered psychotic breaks that led to his suicide.

158.    The mental health supervisor's conduct severely violated acceptable standards of care. Upon information and belief, there was no justifiable reason for failing to ensure that Mr. Encinias received proper RHU Mental Status Examinations.

159.    At the time of the mental health supervisor's actions, Mr. Encinias' need for additional mental health treatment was obvious from both his medical files and his alarming behaviors, which were clear indicators that he was suffering from persistent and severe mental disturbance. Accordingly, the mental health supervisor must have known about and consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

160.    The prison programming coordinator possessed final decision-making authority and responsibility to ensure that Mr. Encinias was assigned to participate in the prison's Residential Drug Abuse Program (RDAP) around February 21, 2018 based on his substance abuse history and the fact that a judge overseeing one of Mr. Encinias' criminal cases had just recommended such treatment in a judicial order. Mr. Encinias was never permitted to participate in the RDAP program despite his numerous pleas to be provided with substance abuse services.

161.    Upon information and belief, the prison programming coordinator knew that Mr. Encinias should have been placed in the RDAP program around February 21, 2018 in order to ensure his physical and mental safety and that his psychological needs were being met.

162.    Despite this knowledge, the prison programming coordinator knowingly or recklessly declined to ensure that Mr. Encinias was placed in the RDAP program around this time.

163.    As a result, Mr. Encinias did not receive adequate mental health care, his mental health rapidly deteriorated, and he suffered psychotic breaks that led to his suicide.

164.    The prison programming coordinator's conduct severely violated acceptable standards of care. Upon information and belief, there was no justifiable reason for failing to ensure

that Mr. Encinias was placed in the RDAP program.

165.    At the time of the prison programming coordinator's actions, Mr. Encinias' need for additional mental health treatment was obvious from both his medical files and his alarming behaviors, which were clear indicators that he was suffering from persistent and severe mental disturbance. Accordingly, the prison programming coordinator/lead must have known about and consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

166.    The CNMCF Centurion supervisor possessed final decision-making authority regarding how mental health policies, practices, and procedures would be implemented by medical and/or mental health personnel at CNMCF during the time period of April through November 2018. The CNMCF Centurion supervisor/lead had the responsibility to ensure that these policies, practices, and procedures were being implemented correctly during this time period and that medical and mental health personnel at CNMCF were sufficiently trained and supervised in these policies, practices, and procedures.

167.    Upon information and belief, the CNMCF Centurion supervisor knew that the mental health policies and procedures being implemented at CNMCF from April through November 2018 were severely deficient and risked endangering the physical and mental health of the prisoners in CNMCF's custody who were in need of mental health services during this time.

168.    Upon information and belief, the CNMCF Centurion supervisor was aware that medical and mental health personnel at CNMCF during this time were inadequately trained and supervised on proper mental health policies and procedures, and that this inadequate training and supervision risked endangering the physical and mental health of the prisoners in CNMCF's custody who were in need of mental health services during this time.

169.    Despite this knowledge, the CNMCF Centurion supervisor knowingly or recklessly

declined to ensure that Constitutionally adequate policies, practices and procedures were being implemented or that medical and mental health personnel at CNMCF were being adequately trained and supervised.

170.    As a result, Mr. Encinias did not receive adequate psychiatric care, his mental health rapidly deteriorated, and he suffered psychotic breaks that led to his suicide.

171.    The CNMCF Centurion supervisor's conduct severely violated acceptable standards of care. Upon information and belief, there was no justifiable reason for failing to ensure that proper mental health policies, practices and procedures were being implemented and that the related training and supervision of these policies was also adequate.

172.    At the time of the CNMCF Centurion supervisor's actions, Mr. Encinias' need for additional mental health treatment was obvious from both his medical files and his alarming behaviors, which were clear indicators that he was suffering from persistent and severe mental disturbance. Accordingly, the CNMCF Centurion supervisor must have known about and consciously disregarded an excessive risk to Mr. Encinias' mental health and safety.

173.    Centurion maintained various widespread patterns and practices which violated Mr. Encinias' Constitutional rights and contributed to his untimely death, including: (1) failing to report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions; (2) severely understaffing its medical and mental health facilities; (3) failing to provide adequate medical documentation or communicate changes in patient conditions to the appropriate correctional officers and/or medical or mental health staff; (4) delaying or denying patient referrals to necessary emergency or other offsite medical services; and (5) failing adequately to train and supervise its employees and agents on procedures necessary to protect patients' health.

174. Centurion failed to report, diagnose, and treat the warning signs of serious conditions for many other patients in circumstances comparable to those of Mr. Encinias. For example:

- In *Jade Hetes v. Centurion et al.*, No. D-101-CV-2019-00113 (N.M. 1st Dist. Ct) Centurion failed to timely report, diagnose, and treat signs of severe mental illness, which resulted in the patient's death from suicide.

- In *Manuela Vigil v. Centurion et al.*, No. D-101-CV-2018-00033 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of abscesses, which resulted in the patient's death.

- In *Michael Wilder v. Centurion et al.*, No. D-101-2018-00608 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat sign of a broken collarbone, which resulted in the patient suffering lengthy, extended pain.  No corrective surgery was ever conducted for ___ years following the accident prior to Mr. Wilder's release from prison.

- In *Jerry Sisneros v. Centurion et al.*, No. D-101-CV-2019-00598 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of diskitis and osteomyelitis, which resulted in the patient's needlessly extended suffering and over a month of avoidable off-site care.

- In *Gerald Wilson v. Centurion et al.*, No. D-101-CV-2019-00691 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of discitis and osteomyelitis, which resulted in the patient developing severe sepsis and lifelong spinal disabilities, and being hospitalized for 35 days.

- In *George Yribe v. Centurion et al.*, No. D-101-CV-2019-00633 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of diskitis and osteomyelitis, which resulted in the patient developing serious and permanent injury.

- In *Dominick Mora-Solis v. Centurion et al.*, No. D-101-CV-2019-00627 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of a severe pressure ulcer, sepsis, and acute chronic osteomyelitis, which resulted in permanent injuries to the patient.

175. The preceding cases, among others, establish that Centurion was on notice of these widespread unconstitutional practices prior to Mr. Encinias' death and thereby knew or should have known that additional safeguards should have been put in place to address patients' signs of serious medical and mental health conditions.

176. Accordingly, it can be inferred that Centurion intentionally failed to report,

diagnose, treat or refer for treatment inmate patients showing serious warning signs of grave illness despite the known and obvious risk to patient safety.

177.    Centurion's widespread practice of failing to report, diagnose, treat or refer for treatment despite clear warning signs of serious medical and mental health conditions shares a close factual relationship with the events in Mr. Encinias' case, and accordingly, the widespread practice was the moving force behind his injuries and death.

178.    Significantly, Centurion personnel failed to conduct full-scale clinical assessments six times in Mr. Encinias' case alone, which establishes a pattern and practice of insufficient reporting, diagnoses, and treatment of serious medical and/or mental health conditions. Although Mr. Encinias satisfied NMCD's criteria mandating that mental health assessments be conducted on six difference instances based on his medical records, Centurion personnel failed to conduct these clinical assessments, which include a thorough review of the patient's medical history and a mental status examination during which a formal diagnosis is made.

179.    Because no evaluation or diagnosis was completed and no formal report was created, Mr. Encinias was never provided with any treatment other than the bare minimum to place him in solitary confinement. He was never provided with increased behavioral health counseling or programming despite his clear need for additional services. Moreover, he was never placed in the facility's inpatient psychiatric unit despite clearly meeting five of the seven placement criteria and only needing to meet one of the criteria to qualify for such placement. Ultimately, his lack of proper mental health support caused him to commit suicide.

180.    As such, Centurion's policy and practice of failing to report, diagnose, treat warning or refer for treatment inmates showing signs of serious medical and mental health conditions proximately caused Mr. Encinias' death.

181.     The fact of Centurion's chronic understaffing of medical positions during the time period leading up to Mr. Encinias' death is indisputable. It is widely known and documented. As emphasized in the October 23, 2018 New Mexico Legislative Finance Committee (hereinafter LFC) program evaluation of NMCD (the "Committee Report"): "Both state and contractor medical positions are frequently understaffed, threatening the quality of care provided. The Corrections Department's Office of the Medical Director, state employees who are responsible for overseeing the care, opportunities, and education necessary for patients to improve their health, including medical provider contract oversight, had a 25 percent vacancy rate as of October 2018"—two months before Mr. Encinias' death.

182.     In particular, the Committee Report noted that "Centurion . . . struggled to recruit and retain staff, incurring fines of $1.1 million in each of the last two fiscal years for critical vacancies including dentists, licensed nurse practitioners, pharmacists, and medical directors."

183.     Critically, the Committee Report further confirmed that "[t]he Mental Health Bureau, responsible for providing services to inmates in state prisons, had a 40 percent total vacancy rate, of which most were behavioral and mental health therapists." And Centurion suffered critical mental health vacancies in 2017 and 2018, for which it incurred roughly $500,000 in fines, "including mental health director, drug and alcohol counselors, a psychologist, and a regional director."

184.     More specifically, in the year 2018, CNMCF had no health services administrator, licensed practical nurse for Mental Health, psychiatric health doctor, nurse manager, or psychiatrist, among other vacancies.

185.     As of October 2018, two months before Mr. Encinias' suicide, CNMCF had 13 unfilled behavioral health provider positions, an alarming vacancy rate of 50%. Even more

alarmingly, CNMCF had a 100% vacancy rate for its mental health providers—zero mental health providers were in the prison in the critical months leading to Mr. Encinias' suicide.

186.    The LFC report's covered the period through October 2018, just over one month prior to Mr. Encinias' death.  However, it is unlikely that these staffing shortages were corrected in the interim prior to Mr. Encinias' death.

187.    Centurion's pattern and practice of severe understaffing, particularly regarding mental health personnel, is clearly a primary cause of the Constitutional violations concerning Mr. Encinias' mental health treatment leading up to his suicide.

188.    Upon information and belief, Mr. Encinias was unable to receive psychiatric treatment and his requested mental health programming due to the severe shortage of mental healthcare providers at the prison. Numerous important mental health protocols were violated, critical assessments and evaluations foregone, and reports missing in Mr. Encinias' file due to this severe staffing shortage, including the unfilled positions dedicated to oversight of medical services contract compliance. It was this lack of mental health care and contract oversight that exacerbated Mr. Encinias' mental health issues and eventually caused his psychotic breaks and suicide.

189.    Simply put, Mr. Encinias received no psychiatric services largely because there were zero mental health providers working in CNMCF in the months leading up to his suicide.

190.    Through the Committee Report and its own records of vacancies, Centurion was put on notice that this severe understaffing was substantially certain to cause Constitutional violations regarding its patients' medical treatment, yet it chose to disregard that risk and, for years, continued to display a pattern and practice of severe shortages in medical staff, and mental healthcare providers in particular.

191.    Despite the clear lack of sufficient staffing to provide proper psychiatric care for

inmates suffering severe mental health crisis at CNMCF, including Mr. Encinias, Centurion had a policy of refusing to refer inmates out for specialist care no matter how severe medical condition or illness which is reflected in the other lawsuits cited above where each and every inmate was only referred to an emergency department when the inmate was literally on the verge of death and would without question be hospitalized for at least 24 hours relieving Centurion of any financial responsibility for the critically necessary medical care.

192.    Thus Centurion had a policy of severe understaffing, or no staffing at all, of critical medical and in this case mental health personnel while also having a policy against referring inmate patients to outside specialist thus insuring grave harm or death to untreated inmates.

193.    In this way, Centurion acted with deliberate indifference to prisoners' healthcare needs. *See, e.g., Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (finding deliberate indifference to prisoners' healthcare needs where "gross deficiencies in staffing" and procedures cause the prisoner population to be "effectively denied access to adequate medical care").

194.    Centurion failed to provide adequate medical documentation and failed to communicate changes in patient conditions for many other patients in circumstances similar to those of Mr. Encinias. For example, in *Jerry Sisneros v. Centurion et al.*, No. D-101-CV-2019-00598 (N.M. 1st Dist. Ct.), Centurion failed to adequately record vitals, which contributed to the patient's delayed diagnoses and treatment for diskitis and osteomyelitis.

195.    Notably, the Committee Report referenced an audit of Centurion released in June 2018 that put Centurion on notice that its charts fell short of industry best practices, and some charts were "illegible or inaccurate, not filled out and submitted timely, and not used consistently." The Committee Report also emphasized that documentation of certain test results was missing, and intake forms were not completed for all prisoners as required.

196.     Despite clear language in the GSC indicating that Electronic Health Records ("EHR") were required for constitutionally adequate medical care, both Centurion and NMCD deliberately opted against implementation of an EHR.

197.     An EHR would ensure clear, complete, and reliable medical documentation. The decision to forego an EHR, which Centurion has admitted would substantially improve the availability of relevant information in a patient's medical file, can be assumed to have been made to maintain NMCD's and Centurion's ability to retroactively modify, alter, delete or otherwise destroy medical records. The medical record-keeping practices of both Centurion and NMCD are the equivalent of "don't ask, don't tell" designed to provide Centurion with deniability of knowledge of illness with the purpose of escaping liability for callous, wanton, reckless, deliberately indifferent denial of medical care to inmates, including Mr. Encinias.

198.     The preceding cases and report, among others, establish that Centurion was on notice of these widespread unconstitutional practices prior to Mr. Encinias' death and thereby knew or should have known that additional safeguards should have been put in place to address the inadequate medical documentation and communication of changes in patient conditions.

199.     Accordingly, it can be inferred that Centurion intentionally failed to adequately document patient conditions and failed to adequately communicate changes in those conditions despite the known and obvious risk to patient safety.

200.     Centurion's widespread practice of failing to provide adequate medical documentation and communicate changes in patient conditions shares a close factual relationship with the events in Mr. Encinias' case, and accordingly, the widespread practice was the moving force behind his injuries and death.

201.     Notably, Mr. Encinias' case alone reveals sufficient evidence of Centurion's

widespread practice of providing inadequate medical documentation and communication about patient conditions. For example, in Mr. Encinias' 284-day period of incarceration, medical and behavioral health staff violated NMCD policies at least 27 times solely regarding Mr. Encinias' care: Nursing staff failed to perform the required NMCD medical receiving screens four times; Centurion personnel failed to perform nine NMCD pre-lockdown evaluations and a November 2018 psychiatric encounter; personnel violated policies concerning suicide watch eleven times; and behavioral health staff never conducted two full clinical assessments during Mr. Encinias' 180-day screens in August 2020.

202.    Because Centurion personnel did not adequately document or otherwise communicate Mr. Encinias' rapidly deteriorating medical and mental health condition to the appropriate personnel, he was not provided with the medical and mental health treatment that he clearly needed, which caused him to succumb to his suicidal ideation.

203.    Accordingly, Centurion's policy and practice of providing inadequate medical documentation and failing to communicate changes in patient conditions to appropriate personnel proximately caused Mr. Encinias' death from suicide.

204.    As outlined in the Committee Report, in 2018, the New Mexico Medical Review Association conducted an audit of Centurion's medical services in prisons and recommended that staff be better educated by both Centurion and NMCD on chart documentation standards and consistency and in completing prisoner intake forms correctly. According to Centurion's auditors, the need for additional training and supervision was apparent and should have been prioritized.

205.    Similarly, the extensive violations of NMCD protocol in Mr. Encinias' case provide compelling evidence that Centurion had a widespread pattern and practice of failing to adequately train and supervise its personnel. As discussed in more detail above, Centurion medical

and behavioral health staff violated NMCD policies at least 27 times related to just Mr. Encinias'
care. And 27 significant violations regarding a single prisoner in a period of 284 days suggests the
presence of a more systemic lack of training and oversight.

206.    As such, Centurion's widespread failures to train and supervise its personnel were
a primary cause of the Constitutional violations suffered by Mr. Encinias. Each of the 27 NMCD
policy violations deprived Mr. Encinias of the opportunity to be evaluated, diagnosed, and to be
prioritized in receiving the mental health treatment that he so desperately needed. Because mental
health personnel were not adequately trained or supervised to ensure that these NMCD policies
were followed, Mr. Encinias never received the opportunity to obtain additional psychiatric
services. Consequently, his mental health rapidly deteriorated and he suffered a series of psychotic
breaks that ended in his suicide.

207.    Training and supervision regarding proper medical treatment protocol and
documentation was required because, as Centurion knew or should have known to a moral
certainty, Centurion's personnel would commonly confront situations where they would need to
assess the severity and emergency nature of patients' medical conditions. This is the one of the
primary tasks that these personnel were hired to do.

208.    Additionally, documenting and assessing the next steps in a patient's medical
treatment is precisely the type of complex and important decision that requires training and
supervision, as making the wrong choice in these instances will frequently cause the deprivation
of prisoners' constitutional rights.

209.    As evinced by Mr. Encinias' situation and the others cited in subsection A of this
section, Centurion's widespread pattern of deficient training and supervision presents an obvious
potential to violate patients' Constitutional rights, because there has been a growing history where

prisoners are denied serious medical care to which they are entitled, and they suffer from long-term disability or death as a result.

210.    Centurion was alerted to an obvious deficiency in its training and supervision through the many prior lawsuits against it alleging unconstitutional medical care. It was also put on notice of these deficiencies through the 2018 audit results requiring that it provide better training and oversight of its personnel.

211.    Centurion's failure to do so is further evidence of its deliberate indifference to the Constitutional violations caused by its widespread deficiencies in training and supervising.

212.    At the time that Mr. Encinias was housed at CNMCF and in the custody of NMCD, he faced substantial impairments of major life activities due to his mental disability, which was confirmed through various mood disorder diagnoses.

213.    CNMCF and NMCD were both on notice of Mr. Encinias' disability, because his mental health diagnoses were constantly being documented in his prison file, and he was frequently sent to the RHU on suicide watch.

214.    At the times relevant to this complaint, Mr. Encinias was suffering from debilitating, persistent, and long-term depression and mood disorders. Because of his diagnoses, he could barely take care of himself and lost nearly all motivation and practical ability to complete even basic life tasks like eating, bathing, and maintaining proper hygiene. Even more, he would often engage in self harm due to his disability.

215.    While facing these substantial impairments to his daily activities, Mr. Encinias sought the reasonable accommodation of being given access to psychological services so that he could participate in and receive the benefits of the other opportunities offered in the prison.

216.    He requested to receive regular and ongoing counseling and to participate in

treatment programs, but the prison would not grant this accommodation in any form. In his June 1, 2018 application for admission into the prison Behavioral Health Services' Residential Substance Abuse Program (RDAP), he wrote: "I wanna change the way I live my life and the ability to live and maintain living a life clean, healthy and sober. Please." In this application, he also expressed a desire to "learn other ways to be happy sober." Additionally, he signed a form on June 21, 2018 agreeing to be placed in prison's voluntary intensive outpatient treatment program (IOP). And finally, on July 6, 2018, he asked the RHU Sergeant to receive regular counseling "so that he could express his feelings." Yet, none of his requested accommodations were granted.

217.     Upon information and belief, Mr. Encinias would have been eligible and able to participate in the full array of prison educational, religious, recreation, and group programs if he had not been disabled by his severe mental illness. However, because Mr. Encinias suffered from severe depression and mental illness, his mental state would not allow him to participate in all of the prison's otherwise-available educational, religious, recreational and group programming.

218.     However, upon information and belief, if CNMCF and NMCD would have provided Mr. Encinias with mental health counseling or other mental health programming accommodations, he would have transitioned into a more stable mental state that would have allowed him to receive the full benefit of CNMCF and NMCD's educational, religious, recreation, and group programming.

219.     Despite the fact that Mr. Encinias repeatedly pleaded for mental health accommodations, CNMCF and NMCD were unwilling to even attempt to provide Mr. Encinias with this type of accommodation.

220.     Furthermore, any accommodation that CNMCF or NMCD may claim to have made was unreasonably inadequate, because Mr. Encinias' prison medical records reveal that he was

frequently suicidal in the months leading up to his death, and he attempted suicide on May 7, 2018 and August 22, 2018 before succeeding in his attempt on December 2, 2018.

221.    Because of his debilitating mental state, he was frequently sent to the RHU on suicide watch, where he was unable to access most of the prison's educational, religious, recreation, and group programming. Even if he had been allowed access to these programs while in the RHU, he was not provided with sufficient mental health service accommodations to bring him to a mental state where he could actually participate in these programs. Accordingly, Mr. Encinias was denied meaningful access to these programs.

222.    CNMCF and NMCD knew that Mr. Encinias required further mental health service accommodations in order to participate in the prison's educational, religious, recreation, and group programs because his prison records clearly specified (1) a long history of RHU suicide watch placements through which Mr. Encinias' access to prison programs was strictly limited, (2) repeated attempts by Mr. Encinias to obtain his requested accommodation of additional mental health services, and (3) a persistent history of severe mental illness and suicidal ideation.

223.    Both CNMCF and NMCD, through their employees and agents, acted with deliberate indifference to the strong likelihood that their practices of denying Mr. Encinias his requested mental health services would likely result in a violation of Mr. Encinias' federally protected right not to be discriminated against because of his mental disability. Despite this knowledge, CNMCF and NMCD failed to provide Mr. Encinias with any meaningful mental health supports.

224.    Importantly, Mr. Encinias' requested accommodation to receive mental health support would not have fundamentally altered the nature of the prison's services, programs, or activities or created an undue burden on the prison staff. Each of the accommodations suggested

by Mr. Encinias was already available and widely utilized by other individuals in the prison without issue. Upon information and belief, CNMCF and NMCD had no rational reason to deny these services to Mr. Encinias, who was one of the prisoners with arguably the most need for such accommodations. Accordingly, there is no true security or institutional concern regarding Mr. Encinias' requested accommodations. On the contrary, analogous accommodations are commonplace and cause little to no burden on the prison.

225.    Because CNMCF and NMCD failed to provide Mr. Encinias with a reasonable accommodation, Mr. Encinias was made to suffer more pain and punishment than non-disabled prisoners, and he was thereby discriminated against solely because of his disability. His mental state was left to deteriorate until he was subjected to regular RHU placement, which ultimately exacerbated his mental deterioration and led to his death. In addition to these physical injuries and other harms, the fact that Mr. Encinias was made to endure intentional discrimination by CNMCF and NMCD was intrinsically harmful by its very nature, thereby further compounding his injuries and suffering.

226.    Moreover, upon information and belief, CNMCF and NMCD have a widespread pattern and practice of excluding the mentally ill from the prison's programs, services, and activities by uniformly placing mentally ill prisoners in solitary confinement even when there is no valid penological reason for doing so.

227.    As a direct result of Defendants' unlawful conduct, Mr. Encinias suffered tremendous pain, injuries, anguish, suffering, and, ultimately, death, which entitles his Estate to compensatory and special damages by way of survival.

228.    Further, Plaintiff is entitled to attorney's fees and costs pursuant to U.S.C. § 1988, in addition to pre-judgment interest and costs as allowed by federal law.

229.    Plaintiff is also entitled to punitive damages against each of the Defendants, as their actions were done with malice or, minimally, with reckless indifference to Mr. Encinias' federally protected rights.

230.    On July 9, 2020, District Court Judge Matthew J. Wilson issued an Order Granting Motion for Spoliation Sanctions in District Court Case No. D-101-CV-2019-00720.

231.    Judge Wilson found that the New Mexico Department of Corrections did not preserve the surveillance video showing the outside of Mr. Encinias' jail cell for the four hours preceding his suicide.  This evidence is relevant to establish whether officers at the prison facility were properly doing their jobs by maintaining a routine inspection of Mr. Encinias' jail cell before his suicide.

232.    The New Mexico Department of Corrections Defendants' destruction of the surveillance video constitutes spoliation of evidence and has unfairly prejudiced Plaintiff in the prosecution of her claim.

233.    Defendants Kyle Tennison and Kyle Gonzales are guards at CNMCF who are trained to recognize inmates who are suicide risks.

234.    Adonus Encinias was a known suicide risk.

**<u>FIRST CAUSE OF ACTION</u>**
**DELIBERATE INDIFFERENCE TO A KNOWN MEDICAL CONDITION IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, COGNIZABLE UNDER 42 U.S.C. SECTION 1983 (MHM HEALTH PROFESSIONALS, INC., CENTURION CORRECTIONAL HEALTHCARE OF NEW MEXICO, LLC AND ALL INDIVIDUALLY NAMED DEFENDANTS)**

235.    Plaintiff reincorporates and re-alleges each and every allegation contained in this Complaint, whether set forth above or below, as if fully set forth herein.

236.    Pursuant to the Constitutional protections of the Eighth and Fourteenth

Amendments, MHM Health Professionals, Inc., Centurion Correctional Healthcare of New Mexico, LLC and all individually named defendants had the following duties:

  a. to see that measures were in place to reasonably ensure the safety of inmates and detainees at the prison, specifically including Adonus Encinias;

  b. to implement such measures as would reasonably ensure the safety of inmates, including the safety of Adonus Encinias;

  c. to see that measures were in place to reasonably ensure that inmates, including Adonus Encinias, were provided a level of health care that a civilized society would think necessary;

  d. to reasonably ensure that inmates like Adonus Encinias did not die from a preventable death while in the custody and care of Defendants.

237. Defendants breached these duties and were deliberately indifferent to Adonus Encinias' needs in at least the following ways:

  a. by failing to provide adequate medical care and treatment and failing to properly supervise Adonus Encinias, causing Adonus Encinias to suffer preventable death due to inadequate medical care and treatment while in custody;

  b. by failing to have policies and procedures in place, and/or failing to adequately supervise or train employees and contractors in accordance with said polices and procedure, and/or by failing to enforce such policies and procedures so as to ensure the medical safety of inmates such as Adonus Encinias;

c.     by failing to have policies and procedures in place, and/or by failing to adequately supervise or train employees and contractors in accordance with said polices, and/or by failing to enforce such policies and procedures intended to ensure that inmates like Adonus Encinias were provided a level of health care that a civilized society would think necessary;

d.     by failing to have policies and procedures in place and/or by failing to adequately supervise and/or train employees and contractors in accordance with said polices, and /or by failing to implement such policies and procedures intended to ensure the reasonable safety and health of inmates suffering mental health issues such as Adonus Encinias; and

e.     by failing to intervene in a medically reasonable ways to prevent Adonus Encinias' preventable death.

238.     Repeatedly, Defendants were deliberately indifferent to Adonus Encinias' medical and mental health needs. The policies and procedures developed and administered were deficient and deliberately indifferent to foreseeable circumstances, such as an inmate suffering a mental health crisis and suicide, such as suffered by Adonus Encinias.

239.     As a direct and proximate result of Defendants' deliberate indifference, Adonus Encinias died by suicide while in the custody of Defendants the State of New Mexico and NMCD, and subsequently died from a preventable death.

240.     As a result of the constitutional deprivation suffered by Adonus Encinias at the hands of the Defendants, Plaintiff is entitled to damages in an amount not presently

determinable, but to be proven at the time of trial.

241.    Due to the egregious nature of Defendants' deliberate indifference and reckless disregard for the health and safety of Adonus Encinias, Plaintiff seeks punitive damages against said Defendants as may be allowed by law. Further, Plaintiff is entitled to an award of attorneys' fees pursuant to 42 U.S.C. Section 1983.

242.    Individually named Defendants are not shielded by qualified immunity for their deliberate indifference to Mr. Encinias' serious medical needs because of the well-documented 10th Circuit precedent notifying medical and prison personnel that the Eighth Amendment is violated when such personnel fail to take reasonable measures to provide a patient with access to medical attention and/or deny medical care to a patient with serious psychological needs, as occurred in Mr. Encinias' case with each of the Defendants named herein.

## SECOND CAUSE OF ACTION
### FAILURE TO TRAIN AND SUPERVISE IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, COGNIZABLE UNDER 42 U.S.C. 1983(MHM HEALTH PROFESSIONALS, INC., CENTURION CORRECTIONAL HEALTHCARE OF NEW MEXICO, LLC AND ALL INDIVIDUALLY NAMED DEFENDANTS)

243.    Plaintiff reincorporates and re-alleges each and every allegation contained in this Complaint, whether set forth above or below, as if fully set forth herein.

244.    Defendants may be held liable for damages for constitutional violations caused by their failure to adequately train or supervise their subordinates due to their deliberate indifference.

245.    Defendants foresaw, or should have foreseen, the possibility that when certain inmates are suffering from a mental health crisis, they would be at heightened risk of attempt suicide, resulting in serious medical conditions for those inmates. Yet Defendants failed to

provide adequate policies, procedures, or training to their employees or contractors to reasonably provide for the health and safety of inmates suffering from a mental health crisis. In this, Defendants were deliberately indifferent to the health and safety of Adonus Encinias and their deliberate indifference caused his death.

246.     Named Defendants, in their individual and official capacities, failed to provide adequate policies, procedures, and/or training to their employees or contractors and they failed to instruct and direct them to adequately monitor and respond to inmates suffering from a mental health crisis, leading to serious and manifestly life-threatening medical conditions. In this, Defendants were deliberately indifferent to the health and safety of Adonus Encinias and their deliberate indifference caused his death.

247.     As a direct and proximate result of Defendants' actions and inactions and/or deliberate indifference, Adonus Encinias was deprived of his life in violation of rights as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

248.     As a result of the Constitutional deprivation suffered by Adonus Encinias at the hands of the Defendants, Plaintiff is entitled to damages in an amount not presently determinable but to be proven at the time of trial.

249.     Due to the egregious nature of Defendants' deliberate indifference and reckless disregard for the health and safety of Adonus Encinias, Plaintiff seeks punitive damages against said Defendants as may be allowed by law. Further, Plaintiff is entitled to an award of attorney fees pursuant to 42 U.S.C. Section 1988.

**THIRD CAUSE OF ACTION**
**UNLAWFUL CUSTOM, POLICY, OR PRACTICE BY MHM HEALTH**
**PROFESSIONALS, INC., CENTURION CORRECTIONAL HEALTHCARE OF NEW**
**MEXICO, LLC AND ALL INDIVIDUALLY NAMED DEFENDANTS IN VIOLATION OF**
**THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES**
**CONSTITUTION, COGNIZABLE UNDER 42 U.S.C. SECTION 1983**

**(MHM HEALTH PROFESSIONALS, INC., CENTURION CORRECTIONAL HEALTHCARE OF NEW MEXICO, LLC AND ALL INDIVIDUALLY NAMED DEFENDANTS)**

250.   Plaintiff reincorporates and re-alleges each and every allegation contained in this Complaint, whether set forth above or below, as if fully set forth herein.

251.   If a governmental agency or agent has a policy, custom, or practice that tolerates the commission of unconstitutional acts by its agents, officers and/or employees, then the agency and/or the officer, employees or contractors who are in a position to set the policy, custom, or practice may be held liable directly for the consequences of any unconstitutional acts by said persons.

252.   New Mexico Corrections Department and/or Central New Mexico Correctional Facility corrections officers, agents, and employees were deliberately indifferent and failed to notice and /or intercede to save Adonus Encinias from death even though Adonus Encinias was clearly in dire need of medical assistance. The Defendants' conduct, through those officers and employees, evidenced a custom of laxity regarding the supervision and monitoring of the health and safety of inmates and pretrial detainees, so that such custom was or became a de facto official policy. Fact discovery will bear out and provide further support of such policy, custom, or practice. Defendants, by allowing such a policy, custom, or practice to develop and exist, exhibited deliberate indifference to the rights, health, and safety of Adonus Encinias.

253.   MHM Health Professionals, Inc. and/or Centurion Correctional Healthcare of New Mexico, LLC's agents and/or employees were deliberately indifferent and failed to notice and/or intercede to save Adonus Encinias from death even though Adonus Encinias was clearly in dire need of medical assistance. The Defendants' conduct, through those officers and employees, evidenced a custom of laxity regarding the supervision and monitoring of the health

and safety of inmates and pretrial detainees, so that such custom was or became a *de facto* official policy. Fact discovery will bear out and provide further support of such policy, custom, or practice. Defendants, by allowing such a policy, custom, or practice to develop and exist, exhibited deliberate indifference to the rights, health, and safety of Adonus Encinias.

254.    As a direct and proximate result of Defendants' actions and inactions, and/or deliberate indifference, Adonus Encinias was deprived of his life in violation of rights as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

255.    As a result of the Constitutional deprivation suffered by Adonus Encinias at the hands of the Defendants, Plaintiff is entitled to damages in an amount not presently determinable, but to be proven at the time of trial.

256.    Due to the egregious nature of Defendants' deliberate indifference and reckless disregard for the health and safety of Adonus Encinias, Plaintiff seeks punitive damages against said Defendants as may be allowed by law. Further, Plaintiff is entitled to an award of attorney fees pursuant to 42 U.S.C. Section 1988.

## FOURTH CAUSE OF ACTION
### NEGLIGENT TRAINING AND SUPERVISION

257.    Plaintiff reincorporates and re-alleges each and every allegation contained in this Complaint, whether set forth above or below, as if fully set forth herein.

258.    Defendants Central New Mexico Correctional Facility, New Mexico Corrections Department, MHM Health Professionals, Inc. and Centurion Correctional Healthcare of New Mexico, LLC had a duty to properly supervise, educate, and train their employees, agents, and contractors regarding evaluation, treatment, monitoring, and administration of medical treatment to inmates including, but not limited to, those suffering

from a mental health crisis.

259.     Defendants failed to properly supervise, educate and train t h e i r employees, contractors, or agents regarding evaluation, treatment, monitoring, and administration of medical treatment to inmates including, but not limited to, those s u f f e r i n g  a  m e n t a l  h e a l t h  c r i s i s .

260.     Defendants' failure to properly train and supervise their employees, contractors, or agents in such a manner as alleged above directly caused the wrongful death of Adonus Encinias.

261.     Defendants are liable for damages caused by the negligence of their employees while working within the scope of their employment in an amount not presently determinable but to be proven at the time of trial.

**FIFTH CAUSE OF ACTION**
**AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101 *et seq.*)**
**(against CNMCF and NMCD)**

262.     Plaintiff reincorporates and re-alleges each and every allegation contained in this Complaint, whether set forth above or below, as if fully set forth herein.

263.     At the times relevant to this Complaint, Mr. Encinias had a disability within the meaning of the Americans with Disabilities Act, as he had been diagnosed with various mood disorders, including severe depression.

264.     Aside from his disability, Mr. Encinias was otherwise qualified to participate in, and receive the benefits of, the programs, services, and activities offered by CNMCF and NMCD, which are described in this Complaint.

265.     CNMCF and NMCD are both public entities as defined in 42 U.S.C. § 12131(1), as both are instrumentalities of the State of New Mexico.

266.     Under Title II of the ADA, CNMCF and NMCD are responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disabilities.

267.     Despite Mr. Encinias' known and obvious disability, CNMCF and NMCD failed to reasonably accommodate his disability and discriminated against him, as described herein.

268.     Both CNMCF and NMCD knew that Mr. Encinias was disabled and that he required an accommodation, yet they did not provide him with an accommodation.

269.     Solely because of Mr. Encinias' disability, CNMCF and NMCD excluded and denied him access to, and the benefits of, each program, service, and activity described herein. Thus, Mr. Encinias has been subjected to discrimination in each program, service, or activity as a result of his disability.

270.     CNMCF and NMCD engaged in this discriminatory practice with malice or, minimally, with reckless indifference to Mr. Encinias' federally protected rights.

271.     Mr. Encinias has been injured as a result of this discrimination, as described elsewhere in this Complaint.

272.     Finally, CNMCF and NMCD are not shielded by qualified immunity for their violations of the Americans with Disabilities Act, as qualified immunity is not available for such claims.

## SIXTH CAUSE OF ACTION
### REHABILITATION ACT (29 U.S.C. § 701 et seq.)
**(against CNMCF and NMCD)**

273.     Plaintiff reincorporates and re-alleges each and every allegation contained in

this Complaint, whether set forth above or below, as if fully set forth herein.

274.    At the times relevant to this Complaint, Mr. Encinias was handicapped within the meaning of the Rehabilitation Act, as he had been previously diagnosed with various mood disorders, including severe depression.

275.    Aside from his disability, Mr. Encinias was otherwise qualified to participate in, and receive the benefits of, the programs, services, and activities offered by CNMCF and NMCD, which are described in this Complaint.

276.    Both CNMCF and NMCD receive federal financial assistance.

277.    Under the Rehabilitation Act, CNMCF and NMCD are responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disabilities.

278.    Despite Mr. Encinias' known and obvious disability, CNMCF and NMCD failed to reasonably accommodate his disability and discriminated against him, as described herein.

279.    Both CNMCF and NMCD knew that Mr. Encinias was disabled and that he required an accommodation, yet they did not provide him with an accommodation.

280.    Solely because of Mr. Encinias' disability, CNMCF and NMCD excluded and denied him access to, and the benefits of, each program, service, and activity described herein. Thus, Mr. Encinias has been subjected to discrimination in each program, service, or activity as a result of his disability.

281.    CNMCF and NMCD engaged in this discriminatory practice with malice or, minimally, with reckless indifference to Mr. Encinias' federally protected rights.

282.    Mr. Encinias has been injured as a result of this discrimination, as described elsewhere in this Complaint.

283.    Finally, CNMCF and NMCD are not shielded by qualified immunity for their violations of the Rehabilitation Act, as qualified immunity is not available for such claims.

## PUNITIVE DAMAGES

284.    Plaintiff reincorporates and re-alleges each and every allegation contained in this Complaint, whether set forth above or below, as if fully set forth herein.

285.    The acts and omissions complained of in the Causes of Action stated above are, upon information and belief, believed to be of such an egregious nature, in reckless, wanton and total disregard to the rights of Plaintiff, that in addition to actual damages ascertained and demonstrated by a preponderance of the evidence, punitive damages or exemplary damages to punish and deter this type of act from occurring in the future may well be appropriate.

## JURY DEMAND

286.    Plaintiff demands a jury trial of all issues so triable and requests that an advisory jury be empaneled, should the court deem it appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that Judgment be entered in her favor and against Defendants in an amount to be proven at the time of trial for all of their damages, compensatory and other, including but not limited to punitive damages, for costs associated with the bringing of this cause of action, for their reasonable attorney fees as allowed by law, for pre-judgment interest and post-judgment interest, and for such other further relief as the Court deems just and proper.

Respectfully Submitted,

SANDOVAL FIRM

*/s/ Richard A. Sandoval*
Richard A. Sandoval
1442-D South Saint Francis Dr.
Santa Fe, NM 87505
(505) 795-7790
 rick@sandovalfirm.com

 -and-

COLLINS & COLLINS, P.C.


*/s/ Parrish Collins*
Parrish Collins
P.O. Box 506
Albuquerque, NM 87103-0506
(505) 242-5958
parrish@collinsattorneys.com

 *Attorneys for Plaintiff*