IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TRINI ENCINIAS, as personal representative of the
ESTATE OF ADONUS R. ENCINIAS, deceased,

     Plaintiff,

v.                                  Case No. 21-cv-1145 KG/SCY

NEW MEXICO CORRECTIONS DEPARTMENT, and
ISABELLE DOMINGUEZ, CHRIS MAURER,
BEVERY WOODBURY, TITO VIDAL, in their
individual capacities,

     Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

     This matter is before the Court on Defendants' Motion to Dismiss the Second Amended

Complaint. (Doc. 47). The Motion is fully and timely briefed. (Docs. 54, 57). Having

considered the briefing and the applicable law, the Court grants the Motion.

I.    *Introduction*

     This case concerns the tragic death by suicide of a prison inmate, Adonus R. Encinias,

who was under the custody and care of the State of New Mexico at Central New Mexico

Correctional Facility. Second Amended Complaint (Doc. 45) at ¶ 119. Mr. Encinias' mother,

Trini Encinias, as the personal representative of his estate, brings four claims: (1) that individual

state employees Isabelle Dominguez, Chris Maurer, Tito Vidal, and Beverly Woodbury, sued in

their individual capacities, were deliberately indifferent to Mr. Encinias' serious medical need in

violation of his constitutional right to be free of cruel and unusual punishment pursuant to 42

U.S.C. § 1983, the Eighth and the Fourteenth Amendments; (2) that Centurion Correctional

Healthcare, a contractor acting in the capacity of the state, violated the same right through a

policy and practice of denying medical care, also brought pursuant to § 1983, the Eighth and the

Fourteenth Amendments; (3) that the New Mexico Corrections Department (NMCD) violated

Mr. Encinias' rights under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et*

*seq*.; and (4) that the NMCD violated Mr. Encinias' rights under the Rehabilitation Act, 29

U.S.C. § 701 *et seq*.  *Id*. at ¶¶ 235–283.  Because Centurion Correctional Healthcare was

dismissed from this case, (Doc. 66), and this Motion is brought by the remaining NMCD

defendants, Count 2 is not applicable, and only Counts 1, 3, and 4 are implicated here.

NMCD and the individual defendants now urge dismissal for the following reasons: first,

because the Fourteenth Amendment is not applicable and thus Count 1 should be dismissed to

the extent it is brought pursuant to the Fourteenth Amendment; second, because Ms. Encinias

fails to state a § 1983 claim in Count 1; third, that regardless, qualified immunity bars the suit

against the individual defendants in Count 1; fourth, that the ADA and Rehabilitation Act claims

in Counts 3 and 4 do not survive the decedent's death; and, fifth, even if not, Ms. Encinias fails

to state claims pursuant to the ADA and the Rehabilitation Act.  *Generally* (Doc. 47).

Regarding the first issue, Defendants argue that because Mr. Encinias was an inmate and

not a pre-trial detainee, there is no good faith reason to include a Fourteenth Amendment claim

and that all such claims should be dismissed.  *Id*. at 5–6.  Ms. Encinias counters that the

Fourteenth Amendment incorporates the Eighth Amendment against state actors and thus her

claim properly references the Fourteenth Amendment.  (Doc. 54) at 4–6.  The Court agrees, and

is not persuaded to dismiss the Fourteenth Amendment claims considering that (1) the parties

seem to agree that the Eighth Amendment provides the substantive law for deliberate

indifference in this case, (Doc. 47) at 5, (Doc. 54) at 6; (2) courts "apply the same deliberate-

indifference standard no matter which amendment provides the constitutional basis for the

claim," whether the Eighth or Fourteenth, *George, on behalf of Bradshaw v. Beaver Cnty., by & through Beaver Cnty. Bd. of Commissioners*, 32 F.4th 1246, 1256 (10th Cir. 2022); and (3) given that the first Count references both amendments, dismissing Fourteenth Amendment claims would have no practical effect on the claim.  The Court will analyze the constitutional claim under the Eighth Amendment and otherwise declines to dismiss Count 1 on this ground.

That leaves the following four issues for consideration:

(1) Whether the Second Amended Complaint states an Eighth Amendment Claim;

(2) Whether the individual Defendants are entitled to qualified immunity;

(3) Whether the ADA and Rehabilitation Act Claims survive; and

(4) Whether the Second Amended Complaint states ADA and Rehabilitation Act Claims.

The Court concludes first that while the Complaint states an Eighth Amendment claim, the Defendants are entitled to qualified immunity because Ms. Encinias does not show that the law was clearly established at the time of Mr. Encinias' death.  Next, the Court concludes that the Complaint fails to state ADA or Rehabilitation Act Claims.  On these grounds, the Court grants the Motion.

II.   *Background*

A. *Factual Background*

Mr. Encinias was 22 years old when he was sentenced to a term of incarceration by a New Mexico court, and on February 21, 2018, he entered state custody at the Central New Mexico Correctional Facility (CNMCF).[1]  (Doc. 45) at ¶¶ 20, 23.  About nine months later, on December 2, 2018, Mr. Encinias was found dead in his cell.  *Id*. at ¶ 119.

---

[1] Because at the dismissal stage the Court takes all well-pled facts as true, *Santa Fe Alliance for Public Health and Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021), the Court accepts these facts from Ms. Encinias' Second Amended Complaint (Doc. 45).

Mr. Encinias entered prison suffering from multiple health issues: a substance abuse history which included heroin, methamphetamine, cocaine, marijuana, and benzodiazepines; three prior traumatic brain injuries; a seizure disorder; and pericarditis.  *Id.* at ¶ 26.  At the time of his incarceration, he was also taking multiple psychotropic medications for mood disorders, including severe depression.  *Id.* at ¶ 22.  Indeed, his sentence included a requirement that Mr. Encinias be enrolled in the NMCD's Residential Drug Abuse Program (RDAP).  *Id.* at ¶¶ 21, 23.

Mr. Encinias first met with a prison psychiatrist, Dr. Tabet, on March 6, 2018.  Dr. Tabet documented that Mr. Encinias was experiencing anxiety, depression, irritability, visual and auditory hallucinations, insomnia, and fears of correctional officer assault based on a prior assault in jail.  *Id.* at ¶ 24.  Dr. Tabet diagnosed Mr. Encinias with anxiety, posttraumatic stress disorder (PTSD), psychosis, and substance abuse disorder.  *Id.* at ¶ 27.  Dr. Tabet prescribed two medications (Seroquel and Duloxetine), additionally prescribed "support including good coping," and scheduled a follow-up appointment for April 3, 2018.  *Id.* at ¶¶ 28-29.

His initial diagnoses aside, the prison system had a bevy of signs that Mr. Encinias was mentally and emotionally unwell.  One month after his initial diagnoses, Mr. Encinias was seen by another psychiatrist, Dr. Vera, who diagnosed him with PTSD, dysthymia (persistent depressive disorder), intermittent explosive disorder, and anxiety, while noting the following symptoms: nightmares, flashbacks, panic attacks, vivid recollection of past abuse, and that he was hearing the voices of previous abusers.  *Id.* at ¶¶ 33, 35.  In May, Mr. Encinias saw another psychiatrist, Dr. Neilson, who noted three prior suicide attempts before incarceration and diagnosed Mr. Encinias with depressive disorder and substance abuse disorder.  *Id.* at ¶ 58.  In July, 2018, Dr. Granger met with Mr. Encinias and documented severe depression, chronic anxiety, irritability, insomnia, and hallucinations.  *Id.* at ¶ 66.  In August, Dr. Cruz diagnosed Mr.

4

Encinias with PTSD, anxiety disorder, and substance abuse disorder, among other things.  *Id.* at

¶ 78.

In addition, Mr. Encinias requested therapy and mental health support at least 14 times,

sometimes in explicit and dire terms:

- May 1, stating "urgent" need to "speak to mental health," *id.* at ¶ 46;

- May 2, requesting services due to "feeling depression," *id.* at ¶ 49;

- May 16, submitting "urgent request" because "depression at its highest peak" and
requesting release from medical segregation, *id.* at ¶ 55;

- May 25, requesting to speak to counselor, *id.* at ¶ 59;

- June 1, requesting outpatient program, *id.* at ¶ 62;

- June 21, submitting urgent request to speak to mental health staff, *id.* at ¶ 65;

- July 6, requesting therapy session, *id.* at ¶ 67;

- September 2, submitting urgent health request for insomnia, anxiety and stress, *id.*
at ¶ 87;

- September 4, submitting request stating, "I need to see mental health for
depression, I'm almost at a breaking point," *id.* at ¶ 88;

- September 6, telling staff member that he was "desperate to meet with behavioral
health," *id.* at ¶ 90;

- September 13, requesting mental health appointment and threatening to refuse all
medications and food, *id.* at ¶ 91;

- October 15, requesting to be seen once per week by mental health staff, *id.* at ¶
96;

- October 30, requesting medications be adjusted for anxiety, *id.* at ¶ 98;

-      November 15, requesting to speak to mental health provider, *id*. at ¶ 103.

More alarming yet, Mr. Encinias attempted suicide at least three times which were known to prison staff.  First, on May 7, Mr. Encinias wrote a goodbye letter to his mother confessing to taking 15 blood pressure medications to numb the pain of death, asking her not to be affected by his suicide, and dictating what to do with his remains.  *Id*. at ¶ 52.  That letter was intercepted on May 14, but no preventative or therapeutic measures were implemented.  *Id*. at ¶ 54.  Second, on July 18, Mr. Encinias reported to mental health staff that he was actively trying to kill himself, had taken 16.5 doses of Seroquel, and was experiencing hallucinations commanding him to kill corrections officers and then hang himself.  *Id*. at ¶ 69.  Mr. Encinias spent three days on suicide watch.  *Id*. at ¶ 70.  Third, Mr. Encinias was again placed on suicide watch on August 22 when staff witnessed him cutting his arms and he told them he would kill himself if he could not speak with a mental healthcare provider.  *Id*. at ¶ 75.  Finally, though not an outright attempt, on November 17, Mr. Encinias sat for a mental status examination with a social worker and "insisted he wanted to kill himself and go to heaven with his father."  *Id*. at ¶¶ 106.

The core allegation in the complaint is that despite these clear statements of acute mental healthcare need, Mr. Encinias was never provided appropriate medical care.  Specifically, Ms. Encinias alleges that:

-      Mr. Encinias was never enrolled in RDAP, never referred to the Mental Health Treatment Center (MHTC), and never provided counseling or therapy of any kind, *id*. at ¶¶ 31, 36, 45, 48, 51, 59, 61, 63, 65, 74, 76, 79, 86, 101, 108, 111, 118, 135, 160;

-      Mr. Encinias was provided pamphlets on topics like relaxation in lieu of counseling services, *id*. at ¶¶ 68, 96, 103;

-      When Mr. Encinias was found having had 18 seizures over the course of two hours, he was not taken to an emergency room, *id.* at ¶¶ 81–82;

-      Mr. Encinias was placed in restrictive housing for most of his time in incarceration to his detriment and without the required health assessment, *id.* at ¶ 38–42;

-      Mr. Encinias was transferred to different prisons five times in nine months as a way of avoiding appropriate care, *id.* at ¶ 214;

-      Mr. Encinias was twice removed from suicide watch without following required policies related to health evaluation and crisis intervention, *id.* at ¶¶ 71, 80;

-      In his final days Mr. Encinias was removed from suicide watch just before the time limit that would trigger a requirement for a psychiatric evaluation, was placed in medical segregation, and received no mental healthcare until he was found dead in his cell, *id.* at ¶¶ 112–119.

In the aggregate, the factual allegations paint an alarming and sympathetic picture.  The problem for Ms. Encinias' case is that the only remaining defendants against whom the civil rights claim persists are four individuals: Isabelle Dominguez, Chris Maurer, Tito Vidal, and Beverly Woodbury.[2]  The Court must evaluate not the cumulative allegations against the prison system, but the granular allegations made against each named individual.  *See* Section II(C)(ii), *infra*.  Those allegations are as follows.

Ms. Dominguez and Mr. Maurer were both "mental health employees" of NMCD at the Southern New Mexico Correctional Facility (SNMCF).  *See* (Doc. 45) at ¶¶ 17, 72, 74, 135.

---

[2] Claim 1 was pled against eight defendants in their individual capacities, (Doc. 45) at 45, but the four doctors employed by Centurion and/or MHM were previously dismissed, (Doc. 64).  Claim 2 also brought a civil rights action, (Doc. 45) at 46, this time against government contractors Centurion and MHM, both of which were also dismissed, (Docs. 64 & 66), so Claim 2 does not survive.

What kind of training or credentialling they had is unclear, but Ms. Encinias does plead that they had the authority and obligation to ensure that Mr. Encinias received necessary therapeutic services. *Id.* at ¶ 135.  On August 20—after Mr. Encinias' second suicide attempt at a different facility—Ms. Dominguez and Mr. Maurer together completed a behavioral health check form for Mr. Encinias, noting he was "disheveled, hopeless, depressed," hallucinating, psychologically fragile, and decompensating. *Id.* at ¶ 74.  Nonetheless, they determined that a treatment plan was "not applicable" and did not refer him to counseling or therapy. *Id.*  On August 27—after Mr. Encinias' third suicide attempt and seizure episode—Mr. Maurer again conducted an assessment of Mr. Encinias and again noted he was depressed but again did not attempt to provide any therapeutic services. *Id.* at ¶ 86.  On September 6, Mr. Encinias spoke to Ms. Dominguez to request a modification to his medications and express his desperation to meet with behavioral health counselors, but Ms. Dominguez did not attempt to enroll Mr. Encinias in therapy. *Id.* at ¶ 90.

Mr. Vidal was a provisionally licensed clinical social worker at Central New Mexico Correctional Facility (CNMCF), where Mr. Encinias was next transferred. *Id.* at ¶ 99, 102.  On November 9, Mr. Vidal first conducted a mental status examination form and indicated he had reviewed Mr. Encinias' entire mental health file (though he did not seek the required supervisor signature for the form). *Id.* at ¶ 99.  Mr. Vidal again saw Mr. Encinias on November 15 after Mr. Encinias requested to speak to a mental health provider. *Id.* at ¶ 103.  In response to Mr. Encinias' mental health concerns, Mr. Vidal's only prescription was to suggest he read a pamphlet about relaxation. *Id.*

Two days later, Mr. Vidal conducted a mental status examination of Mr. Encinias. *Id.* at ¶¶ 104–108.  Mr. Encinias told Mr. Vidal he wanted to kill himself and had a way to do it and

refused to reassure Mr. Vidal that he would refrain from trying to kill himself in the coming days. *Id.* at ¶¶ 105–106. Mr. Vidal categorized Mr. Encinias as "Clearance Level 5" (denoting a need for the highest level of care) because he was psychotic, a danger to himself, and had made suicide attempts in the last 90 days. *Id.* at ¶¶ 104–105. Mr. Vidal placed Mr. Encinias on suicide watch for his safety and recommended that behavioral health intervene to provide Mr. Encinias with behavioral health services. *Id.* at ¶ 108. Mr. Vidal did not directly contact a psychiatrist, though he had the authority to do so. *Id.* at ¶ 109. Ms. Encinias also alleges that Mr. Vidal did not schedule any of the recommended services himself, though it is unclear if he had the authority to do so.

The next day Mr. Vidal saw Mr. Encinias again and although Mr. Encinias claimed he was not suicidal, Mr. Vidal kept Mr. Encinias on suicide watch because he was hallucinating and reporting demons inside of him. *Id.* at ¶ 110.

The following day, November 19, Mr. Encinas was seen by a different "behavioral health therapist,"[3] Ms. Woodbury, who noted no change in Mr. Encinias' mental health status and left him on suicide watch. *Id.* at ¶ 111. Ms. Encinias alleges that Ms. Woodbury made no attempt to ensure mental health services were actually provided, though it is unclear that she had the authority to do so. *Id.*

On November 20, Mr. Encinias was removed from suicide watch by a non-defendant staff member—Marcia Esquivel—and placed in restrictive housing rather than the infirmary or general population because "there was no other place to place him" while he was "awaiting transit." *Id.* at ¶¶ 112–113. Who made the decision to place him in a restrictive setting is not pled. In restrictive housing, Mr. Encinias was allowed out of his cell for one hour of daily

---

[3] Again, Ms. Woodbury's specific training or credential is unclear from the pleading.

recreation and to use the shower.  *Id*. at ¶ 115.  Mr. Vidal was aware of this situation and could

have referred Mr. Encinias to the Mental Health Treatment Center, but chose not to.  *Id*.

Ms. Woodbury conducted Mr. Encinias' release assessment post-suicide watch on

November 21.  *Id*. at ¶ 116.  Ms. Woodbury did not complete the required clinical assessment,

leaving most of the form blank.  *Id*.  It is unclear how much of that was due to Mr. Encinias'

refusal to be interviewed.  *Id*.  Ms. Woodbury again categorized Mr. Encinias as a "Category 5."

*Id*.  She did not, however, enroll him in any programming—though again it is not pled that she

had the authority to do so.  *Id*.  Ms. Woodbury's supervisor signed and approved the release

assessment.  *Id*. at ¶ 117.

Mr. Encinias was last seen by any behavioral health specialist one week later, on

November 27, when Ms. Woodbury met him and noted no mental health concerns and indicated

no treatment.  *Id*. at ¶ 118.  Five days later, Mr. Encinias was found hanging in his cell.  *Id*. at ¶

119.

B.  *Legal Background*

i.  *Standard of Review for Dismissal*

A court may dismiss a complaint for "failure to state a claim upon which relief can be

granted."  Fed. R. Civ. P. 12(b)(6).  In analyzing a Rule 12(b)(6) motion to dismiss, all "well-

pleaded factual allegations in the complaint are accepted as true and viewed in the light most

favorable to the nonmoving party."  *Santa Fe Alliance for Public Health and Safety v. City of

Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (internal citation omitted) cert. denied sub nom.

*Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 142 S. Ct. 1228 (2022).  A complaint

must contain "enough facts to state a claim to relief that is plausible on its face."  *Id*. (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citation omitted).  While a complaint need not recite "detailed factual allegations," "a plaintiff's

obligation to provide the grounds of his entitle[ment] to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Truman*

*v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (quoting *Twombly*, 550 U.S. at 555).

   ii. *Qualified Immunity*

  Section 1983 of Title 42 authorizes a private cause of action against any person acting

under color of state law for "the deprivation of any rights, privileges, or immunities secured by

the Constitution."  42 U.S.C. § 1983.  Individual defendants named in a § 1983 action, however,

"may raise a defense of qualified immunity, which shields public officials from damages

actions" unless certain exceptional conditions are shown. *Irizarry v. Yehia*, 38 F.4th 1282, 1287

(10th Cir. 2022) (quoting *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)).

  Qualified immunity is an "affirmative defense [that] creates a presumption that the

defendant is immune from suit." *Truman*, 1 F.4th at 1235 (quoting *Est. of Smart by Smart v. City*

*of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020)).  To overcome this presumption, the plaintiff

bears a heavy burden to show both that "the defendant's actions violated a constitutional or

statutory right" and that the "right was clearly established at the time of the defendant's

complained-of conduct." *Irizarry*, 38 F.4th at 1287 (quoting *Truman*, 1 F.4th at 1235).

  Addressing qualified immunity on a motion to dismiss has its own considerations. *E.g.*,

*Bledsoe v. Carreno*, 53 F.4th 589, 607 (10th Cir. 2022) ("Because they turn on a fact-bound

inquiry, qualified immunity defenses are typically resolved at the summary judgment stage rather

than on a motion to dismiss.") (citation omitted).  District courts may grant a motion to dismiss

based on qualified immunity, but "[a]sserting a qualified immunity defense via a Rule 12(b)(6)

motion ... subjects the defendant to a more challenging standard of review than would apply on

summary judgment." *Truman*, 1 F.4th at 1235 (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201

(10th Cir. 2004)). Specifically, the court analyzes "the defendant's conduct *as alleged in the

complaint*." *Id.* (emphasis in original) (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th

Cir. 2014)). "In the context of a § 1983 action against multiple individual governmental actors,

it is particularly important ... that the complaint make clear exactly who is alleged to have done

what to whom, to provide each individual with fair notice as to the basis of the claims against

him or her." *Id.* (quoting *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013)).

   iii. *Eighth Amendment Deliberate Indifference*

  Whether a defendant violated a constitutional right depends on the substantive right

asserted. Prison suicide claims are treated as deliberate indifference to an inmate's serious

medical needs, *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (citation omitted), which

implicates the Eighth Amendment's prohibition against cruel and unusual punishment, *Mata v.

Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

"Prison officials are deliberately indifferent if they fail to take reasonable steps to protect a pre-

trial detainee or an inmate from suicide when they have subjective knowledge that person is a

substantial suicide risk." *George, on behalf of Bradshaw v. Beaver Cnty., by & through Beaver

Cnty. Bd. of Commissioners*, 32 F.4th 1246, 1256 (10th Cir. 2022) (quoting *Crane v. Utah Dep't

of Corr.*, 15 F.4th 1296, 1307 (10th Cir. 2021)).

   iv. *The ADA and Rehabilitation Act*

  Both Title II of the ADA and Section 504 of the Rehabilitation Act prohibit disability-

based discrimination by public entities in the provision of public services. *See* 42 U.S.C. §

12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."); 29 U.S.C. § 794 ("No otherwise qualified individual with a disability…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). The close relationship of Title II and Section 504 means that they can generally be analyzed together under the same standards. *See Miller ex rel. S.M. v. Bd. of Educ.*, 565 F.3d 1232, 1245 (10th Cir. 2009).[4]

III.   *Analysis*

    A.   *Ms. Encinias Cannot Overcome Qualified Immunity Because She Does Not Show the Law Was Clearly Established*

A plaintiff must overcome both prongs of qualified immunity—that they suffered a constitutional violation and that the specific type of violation was clearly established. The Court has discretion to address either prong first. *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because Ms. Encinias does not show the law was clearly established, the Court chooses to address the second prong first.

A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman*, 1 F.4th at 1235 (quoting *Thomas*, 765 F.3d at 1194). "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Reavis Estate of*

---

[4] That said, they are not exactly the same. The "ADA merely requires the plaintiff's disability be a but-for cause (i.e., 'by reason of') of the discrimination, rather than—as the Rehabilitation Act requires—its sole cause (i.e., 'solely by reason of')." *Crane*, 15 F.4th at 1313.

*Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). Clearly established law "must remain moored in a specific set of facts" to show that the "violative nature of *particular* conduct is clearly established." *Crane*, 15 F.4th at 1303 (citation omitted) (emphasis in original). To that end, the Supreme Court has repeatedly instructed courts "not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, 142 S.Ct. 9, 11 (2021) (citing *Ashcroft v. al-Kidd*, 563 U. S. 731, 742 (2011)). Perhaps most important to this case, plaintiff bears the burden of citing to the Court what they think constitutes clearly established law. *Crane*, 15 F.4th at 1303 (quoting *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010)).

The Court notes that at least since 1994 the Tenth Circuit has established the general principle that prison officials may be deliberately indifferent if they fail to take reasonable steps to protect an inmate from suicide when they have subjective knowledge that the person is a substantial suicide risk. *Est. of Hocker by Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994); *Cox v. Glanz*, 800 F.3d 1231, 1248–49 (10th Cir. 2015). That general principle aside, Ms. Encinias still bears the burden of showing that these four Defendants should have been on notice that their particular actions amounted to deliberate indifference—that is, that failure to prescribe or facilitate therapeutic treatment was a constitutional violation.

Ms. Encinias cites to several relevant cases in arguing that "the NMCD Defendants had proper notice that their conduct was unconstitutional." (Doc. 54) at 19. She cites:

- *Sawyers v. Norton*, 962 F.3d 1270, 1285 (10th Cir. 2020);

- *Abila v. Funk*, 220 F. Supp. 3d 1121, 1131 (D.N.M. 2016);

- *Cook v. Bd. of Cty. Comm'rs for Curry*, No. 16-CV-00597, 2018 U.S. Dist. LEXIS 11597, at *30-31 (D.N.M. Jan. 23, 2018);

14

- *Estate of Blodgett v. Correct Care Sols., LLC*, Civil Action No. 17-cv-2690-WJM-NRN, 2018 U.S. Dist. LEXIS 209535, at *7 (D. Colo. Dec. 12, 2018);

- *Romero v. Bd. of Cty. Comm'rs*, 202 F. Supp. 3d 1223, 1261 (D.N.M. 2016); and

- *Dominguez v. Colfax Cty.*, No. CV 14-875 MV/KRS, 2018 U.S. Dist. LEXIS 126847 at *27 (D.N.M. July 30, 2018).

*Id.* at 19–20.

None of these is sufficient to meet the burden of showing that the law on point was clearly established. While trial court decisions may portend future developments in the law, this Court emphasizes the well-established rule that "[d]istrict court cases lack the precedential weight necessary to clearly establish the law for qualified immunity purposes." *Crane*, 15 F.4th at 1306 (string cite omitted). This black-letter statement of law eliminates all but one of Ms. Encinias' cited cases from consideration. It is also axiomatic that caselaw establishing a constitutional right must have been published *before* the alleged conduct so as to put public officials on notice. *Id.* at 1304 n.7 (citing *Elder v. Holloway*, 510 U.S. 510, 516 (1994)). Because the single controlling case cited, *Sawyers v. Norton*, was decided *after* Mr. Encinias' suicide, it could not have notified these Defendants their conduct was unconstitutional, assuming the case did in fact clearly establish law on point, a conclusion this Court does not make.

Without caselaw from the Tenth Circuit or Supreme Court clearly notifying the individual defendants that a failure to provide therapy amounted to deliberate indifference, all four are entitled to qualified immunity.

B. *Ms. Encinias Nonetheless Makes A Facial Showing That The Prison Officials' Deliberate Indifference Violated The Eighth Amendment*

Despite finding the law on point was not clearly established, the Court still determines that Ms. Encinias made a facial showing that Mr. Encinias' rights were violated by Mr. Maurer,

Ms. Dominguez, Mr. Vidal, and Ms. Woodbury.  Though this finding by itself does not save her

claim from the qualified immunity bar, the Court conducts the analysis to address the paucity of

cases on point and avoid the perverse outcome of continually finding no clearly established law

without ever clearly stating the law.

At the risk of repetition, prison officials are "deliberately indifferent" if they fail to take

reasonable steps to protect an inmate from suicide.  *George*, 32 F.4th at 1256; *also Cox*, 800 F.3d

at 1248–49.  The deliberate indifference test "involves both an objective and a subjective

component."  *Mata*, 427 F.3d at 751 (quoting *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th

Cir.2000)).  "[T]he focus of the objective component is the seriousness of the plaintiff's alleged

harm, while the focus of the subjective component is the mental state of the defendant with

respect to the risk of that harm." *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1262

(10th Cir. 2022) (quoting *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir.

2022)).

To satisfy the objective component, the plaintiff must produce evidence that the

prisoner's medical need or harm suffered was "sufficiently serious." *Mata,* 427 F.3d at

753 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "A medical need is sufficiently

serious if it is one that has been diagnosed by a physician as mandating treatment or one that is

so obvious that even a lay person would easily recognize the necessity for a doctor's attention."

*Sealock*, 218 F.3d at 1209 (internal cites and quotes omitted).

Here, Mr. Encinias' condition doubtlessly meets the objective prong in at least two ways.

First, his suicide is a serious harm.  *Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir.

2006) (explaining that "substantial harm can be the ultimate physical injury caused by the

prisoner's illness, so long as the prisoner can show that the more timely receipt of medical

treatment would have minimized or prevented the harm."); *see also Mata*, 427 F.3d at 751 n.3

("[I]t goes without saying that 'suicide is a serious harm.'" (quoting *Collins v. Seeman,* 462 F.3d

757, 760 (7th Cir.2006)); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (observing

that death, "without doubt," is "sufficiently serious to meet the objective component" (citation

omitted)).  And, second, his mental health diagnosis and attendant suffering (*e.g.*, hallucinations,

self-harm, anxiety, depression) were also sufficiently serious because they were diagnosable (and

diagnosed) medical conditions requiring treatment and likely recognizable by even a lay person.

The subjective prong, then, is the correct locus of this dispute.

      The subjective component is satisfied if the official "knows of" *and* "disregards" an

excessive risk to inmate health or safety.  *Mata*, 427 F.3d at 751 (quoting *Farmer*, 511 U.S. at

837).  The official must be aware of the facts from which the inference of a substantial risk of

serious harm could be drawn and also draw that inference.  *Farmer*, 511 U.S. at 837.  "In the

context of an inmate-suicide case, the subjective component requires the defendant to have actual

knowledge . . . of an individual inmate's substantial risk of suicide."  *Cox*, 800 F.3d at 1249.  An

official disregards that risk when he fails to take reasonable measures to abate the risk.  *Quintana*

*v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020).  The reasonable

measures requirement means that even if a prison official actually knows of a substantial risk to

inmate health or safety, that official may nevertheless "be found free from liability if they

responded reasonably to the risk, even if the harm was not ultimately averted."  *Farmer*, 511

U.S. at 844.

      Here, the Court addresses two preliminary issues implicating all Defendants.  First,

deliberate indifference looks somewhat different depending on whether the official is a medical

professional or non-medical prison employee.  Deliberate indifference may be "manifested by

prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05.  Accordingly, the Tenth Circuit recognizes that the subjective component can be met under two theories: failure to properly treat a serious medical condition ("treatment theory") or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ("gatekeeper theory").  *Sealock*, 218 F.3d at 1211.

One source of confusion in this case is whether the four named individuals should be categorized as medical personnel or non-medical prison employees—and, further, what responsibilities and authorities each had in providing care to Mr. Encinias.  Both parties frame the four current Defendants as non-medical personnel.  *See* (Doc. 47) at 11 (Defendants' argument); (Doc. 54) at 10 (Plaintiff's argument).  Presumably, this would make them liable only under a gatekeeper theory.  The Court, however, is not persuaded that they are clearly non-medical personnel.

In the Complaint, Defendants are described as "mental health employees" (Maurer and Dominguez), (Doc. 45) at ¶ 135, "social worker" (Vidal), *id*. at ¶ 109,  and "mental health therapist" (Woodbury), *id*. at ¶ 111.  Those titles are not quite akin to "physician" but are also surely something more than mere prison guard.  Either way, the Court determines from the caselaw that a functional approach to liability is preferred to a strict job-title-based categorization.  That is, Courts have applied the treatment theory or gatekeeper theory based on the role or function of the individual in a particular context rather than based merely on credential.  For example, a lower-level medical employee like a nurse may be liable under both theories—a treatment theory when their function is to treat or a gatekeeper theory in a context

where their only function is to, say, refer an emergency case to a higher-ranking doctor, *e.g.*, *Sealock*, 218 F.3d at 1211. The Court concludes that is an apt analogy for the four Defendants here, who face allegations of both failing to directly provide services and a refusal to refer Mr. Encinias for treatment with higher-ranking psychiatrists. The four Defendants, therefore, will be categorized as lower-ranking medical personnel who are vulnerable to both the treatment and gatekeeper theories.

Next, the Defendants argue that the prison provided *some* medical care and therefore cannot be constitutionally liable. (Doc. 47) at 9–12. This argument is flawed in two ways. First, on the law, the Tenth Circuit has clearly found that the provision of some form of medical treatment does not necessarily foreclose a deliberate indifference claim.

> To summarize, doing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories [*i.e.*, gatekeeper and treatment]. *See Mata*, 427 F.3d at 758. However, merely doing something (with no reference to the underlying condition) does not necessarily insulate one from liability. Instead, a court may need to determine whether there was the functional equivalent of a complete denial of care in light of the specific circumstances. *See Estate of Jensen* [*by Jensen v. Clyde*], 989 F.3d [848,] 860 [(10th Cir. 2021)]; *Oxendine* [*v. Kaplan*], [241 F.3d 1272], 1277–79 & 1277 n.7 [(10th Cir. 2001)].

*Lucas v. Turn Key Health Clinics, LLC*, No. 22-5002, 2023 WL 327846, at *5, __F.4th__ (10th Cir. Jan. 20, 2023) (conducting lengthy treatment and collecting cases).[5] A second error in Defendants' argument that Mr. Encinias received some modicum of medical care is that the aggregate care he accessed over many months is not the subject of the Court's inquiry; rather, the

---

[5] The Court acknowledges this case is too recent for the parties to have benefited from it in their briefing, but the proposition was established before that opinion's lengthy treatment of the issue. *See Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir 2006) (finding deliberate indifference where "cursory" medical treatment a "mere façade."); *also Self*, 439 F.3d at 1232–33 (a "jury may infer conscious disregard" when a prison doctor "responds to an obvious risk with treatment that is patently unreasonable").

specific actions taken by the four individual Defendants is the proper focus.  That brings the

Court now to the task of analyzing the specific facts alleged against each of the four Defendants.

i.   *Ms. Encinias States a Claim Against Isabelle Dominguez and Chris Maurer*

The Complaint sufficiently alleges that Ms. Dominguez and Mr. Maurer knew of Mr.

Encinias' serious risk of suicide where it alleges that they had and would have reviewed his

entire file, including his diagnoses and previous suicide attempts, (Doc. 45) at ¶ 130, in addition

to their own evaluation of him showing hopelessness, depression, hallucination, *etc.*, *id.* at ¶ 74.

"It is well established that a factfinder may conclude that a prison official knew of a substantial

risk from the very fact that the risk was obvious."  *Kikumura*, 461 F.3d at 1294 (internal

quotations and citations omitted).  In addition, knowledge need not be pled with factual certainty.

*Id.* ("malice, intent, knowledge, and other condition of mind of a person may be averred

generally.") (internal quotations and citations omitted).

The Complaint also alleges that neither Ms. Dominguez nor Mr. Maurer took any action

at all to treat Mr. Encinias or alert doctors about his condition.  Whether considered under a

treatment theory or gatekeeper theory, doing nothing in response to knowledge of harm is an

unreasonable response evincing deliberate indifference.  *Turn Key Health Clinics, LLC*, 2023

WL 327846, at *5 ("To summarize, doing nothing in the face of serious medical needs is

obviously sufficient to state a claim under both theories.").

ii.   *Ms. Encinias States a Gatekeeper Theory Claim Against Tito Vidal*

The Complaint directly alleges that Mr. Vidal knew of a serious risk of suicide.  Mr.

Vidal, in fact, categorized Mr. Encinias as a danger to himself and placed him on suicide watch.

(Doc. 45) at ¶ 104.  And under a gatekeeper theory, the Complaint states a plausible claim by

averring that "Mr. Vidal admitted that he never contacted a psychiatrist about any of his concerns

at this time even though he knew he had the authority to do so and the obligation to do so where appropriate." *Id.* at ¶ 109; *cf. Mata*, 427 F.3d at 755 (holding even a brief delay in treatment can be unconstitutional).

The Complaint, however, does not show that Mr. Vidal was indifferent to Mr. Encinias' medical need under a treatment theory because Mr. Vidal placed Mr. Encinias on suicide watch and recommended that he receive therapeutic interventions. *Id.* at ¶ 108. The Court determines that is a reasonable response even if it did not, in the end, avert an eventual suicide.

### iii. *Ms. Encinas States a Treatment Theory Claim Against Beverly Woodbury*

The Complaint again sufficiently alleges that Ms. Woodbury knew of a serious risk of suicide. She met Mr. Encinias on suicide watch and later, after he left suicide watch, she re-categorized him as a "Category 5" risk. *Id.* at ¶¶ 111, 116.

The Complaint also sufficiently alleges an unreasonable response. When Ms. Woodbury first met Mr. Encinias on suicide watch, she discretionarily kept him on suicide watch—that interaction was reasonable. *Id.* at ¶ 111. But during their next interaction, after Mr. Encinias came off suicide watch, Ms. Woodbury categorized him as Category 5 and then neither prescribed nor provided any therapeutic programming. *Id.* at ¶ 116. She did, however, alert her superior about her evaluation. *Id.* at ¶ 117. Thus, under a gatekeeper theory, Ms. Woodbury took reasonable action, but under a treatment theory a jury could determine that she was deliberately indifferent to Mr. Encinias' need.

For these reasons, the Court determines that Ms. Encinias states a claim under Count 1 and makes a *prima facie* showing of an Eighth Amendment violation against Ms. Dominguez, Mr. Maurer, Mr. Vidal, and Ms. Woodbury. That said, the Court reiterates that each of the four Defendants is entitled to qualified immunity.

21

C.     *Ms. Encinias Fails to State ADA and Rehabilitation Act Claims*

Defendants bring two distinct challenges to Ms. Encinias' ADA and Rehabilitation Act

Claims: first, that the Complaint fails to state a claim, and second, that ADA and Rehabilitation

Act claims do not survive the death of the person whose rights were violated.  (Doc. 47) at 12–

19.  The Court concludes that Ms. Encinias fails to state a plausible claim.  That issue being

dispositive, the Court does not reach the survival question.

If a plaintiff fails to allege an essential element of their claim, the complaint is

appropriately dismissed pursuant to Rule 12(b)(6).  *Ellis ex rel. Est. of Ellis v. Ogden City*, 589

F.3d 1099, 1102 (10th Cir. 2009).  Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

(2009).  While "[s]pecific facts are not necessary," a complaint requires sufficient factual

assertions to give the defendant notice of "the grounds upon which [the claim] rests."  *Erickson*

*v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555,

(2007)).

The complaint in this case fails to allege facts establishing intentional discrimination

based on disability.  To state a *prima facie* discrimination claim, a plaintiff must show: (1) he is a

qualified individual with a disability; (2) he was either discriminated against or "excluded from

participation in or denied the benefits of some public entity's services, programs, or activities";

and, (3) such exclusion, denial of benefits, or discrimination was "by reason of his

disability."  *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016) (citing *Gohier*

*v. Enright*, 186 F.3d 1216, 1219 (10th Cir.1999)); *see also* 42 U.S.C. § 12132.[6]

_____

[6] Title II and Section 504 can be analyzed together under the same standard.  *Miller ex rel. S.M.*
*v. Bd. of Educ.*, 565 F.3d 1232, 1245 (10th Cir. 2009).

Briefly, the first two elements are sufficiently pled here.  Mr. Encinias' diagnosed mental illness qualifies him as a person with a disability.  *E.g.*, *Anderson v. Colorado*, 887 F. Supp. 2d 1133, 1143 (D. Colo. 2012).  And prisons are public entities covered by both statutes.  *Ingram v. Clements*, 705 Fed. Appx. 721, 725 (10th Cir. 2017) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998)).  The Supreme Court has held that modern prisons conduct many "services, programs, or activities" that confer "benefits" on inmates, such as recreational activities, medical services, and vocational programs.  *Yeskey*, 524 U.S. at 210.  The Complaint sufficiently alleges that Mr. Encinias was excluded from access to certain programming and entertainment as a result of being in segregated housing.  *E.g.*, (Doc. 45) at ¶¶ 218–219, 227–230.  The third element—that any alleged discrimination or deprivation must be by reason of disability—is where the claim falls short.

Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination, also called disparate treatment; (2) disparate impact; and (3) failure to make a reasonable accommodation.  *J.V.*, 813 F.3d at 1295 (citing *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919 (10th Cir. 2012)).  Ms. Encinias here does not clearly plead which theory she intended to pursue.

Additionally, by requesting monetary damages, Ms. Encinias subjects her disability discrimination claims to heightened standards.  The Tenth Circuit has held that a claim for compensatory damages under the Rehabilitation Act "requires proof the defendant has *intentionally* discriminated against the plaintiff."  *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999) (emphasis added).  And the Supreme Court has held that ADA claims for compensatory damages face a tall Eleventh Amendment state sovereign immunity

hurdle.[7]   While the Court does not conduct the lengthy analysis, the Court notes without

deciding that the complaint likely does not meet the heightened standard because neither the

complaint nor the briefing on the Motion acknowledges or addresses it.  This weights the scales

more heavily on the side of failure to state a claim.

To summarize, whether these claims are considered as intentional discrimination or as

failure to accommodate, Ms. Encinias still must show, under the third element of an ADA claim,

that any discrimination or deprivation was "by reason of" Mr. Encinias' disability.  And, by

virtue of requesting damages, she raises the bar to require some showing of intentionality and/or

that the failure to accommodate pierces state sovereign immunity.

———————————————

[7] For example:

> The Supreme Court has established a three-step framework for evaluating whether
> Eleventh Amendment immunity applies to a state prisoner's Title II claim for
> money damages.  Under that framework, courts must "determine in the first
> instance, on a claim-by-claim basis, ... which aspects of the State's alleged
> conduct violated Title II." *United States v. Georgia*, 546 U.S. 151, 159, 126 S.Ct.
> 877, 163 L.Ed.2d 650 (2006).  If a court concludes that some aspects of a state's
> conduct violated Title II, it should then move on to determine whether that
> conduct violated the Fourteenth Amendment. *Id.*  Notably, the Supreme Court
> has made clear that the Fourteenth Amendment incorporates against the states the
> Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* at
> 157, 126 S.Ct. 877.  As to any such acts of misconduct, Congress's abrogation of
> the states' Eleventh Amendment immunity is constitutionally valid. *Id.* at 158–
> 59, 126 S.Ct. 877.  Finally, at step three of the framework, courts should consider
> the following: "insofar as such misconduct violated Title II but did not violate the
> Fourteenth Amendment, whether Congress's purported abrogation of sovereign
> immunity as to that class of conduct is nevertheless valid." *Id.* at 159, 126 S.Ct.
> 877.  This question is resolved by the reference to the congruence and
> proportionality test set out by the Supreme Court in *City of Boerne v. Flores*, 521
> U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). *See generally Guttman
> v. Khalsa*, 669 F.3d 1101, 1116–17 (10th Cir. 2012).

*Brooks v. Colorado Dep't of Corr.*, 12 F.4th 1160, 1168 (10th Cir. 2021).

Ms. Encinias alleges discrimination in two ways.  First, she asserts that Mr. Encinias was placed in restrictive housing only because of his disability, and that as a result he lost out on prison programming (*e.g.*, common areas, televisions, visitation, socializing, *etc.*).  (Doc. 45) at ¶¶ 212, 218.  In line with a failure to accommodate claim, she alleges that Mr. Encinias requested mental health programming and a television while in restrictive housing and was denied both. *Id.* at ¶ 221.

The problem with her assertion is that Ms. Encinias makes no more than a conclusory claim that Mr. Encinias was placed in restrictive housing because of his disability.  *See id.* at ¶ 114 ("The fact that Mr. Encinias was placed by NMCD in restrictive housing simply because there was nowhere else available to him is a violation of the ADA, as Mr. Encinias was put in that situation because of his disability—his mental health diagnoses."); ¶ 212 ("Solely because of his disability, his mental illness, Mr. Encinias was placed in restrictive housing.").

 The facts, to the contrary, show that he was placed in restrictive housing for either behavioral misconduct or suicide watch.  *See id.* at ¶¶ 212, 227.[8]  Losing access to public services for behavioral reasons, even where that behavior might be related to underlying mental health disabilities, is insufficient to prove disability discrimination.  *E.g.*, *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1313–14 (10th Cir. 2021) (holding placing prisoner in isolation as behavioral punishment distinct from deprivation based on mental diagnosis and upholding dismissal of ADA claim);  *J.V. v. Albuquerque Public Schools*, 813 F.3d 1289 (10th Cir. 2016)

---

[8] Ms. Encinias pleads that some number of placements in restrictive housing do not have a clear reason and therefore argues those unexplained placements must have been based on Mr. Encinias' mental illness.  (Doc. 45) at ¶ 112.  The Court cannot make an inference of discrimination merely based on a lack of other reason, however, because the standard here requires some affirmative showing of causation.  *See Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1259 (10th Cir. 2001) (explaining that *prima facie* ADA claim requires "some affirmative evidence that disability was determining factor").

(holding where student with autism handcuffed and restrained, intervention was because of aggressive behavior and did not evince discrimination based on disability); *J.H. ex rel. J.P. v. Bernalillo County*, 806 F.3d 1255 (10th Cir. 2015) (finding assaultive conduct, not disability, cause of student arrest).

Ms. Encinias relies on *Romero v. Bd. of Cnty. Commissioners for the Cnty. of Curry* to argue against dismissal. 202 F. Supp. 3d 1223 (D.N.M. 2016). That case is distinguishable, however, because there Judge Browning specifically concluded that the plaintiff alleged facts that could establish he was excluded from prison activities solely by reason of his mental disability. *Id*. at 1266. Here, the Court concludes the opposite, finding that no such facts were pled.

Second, Ms. Encinias alleges that Mr. Encinias was deliberately moved from prison to prison to avoid providing care for his mental disability and that such movement did cause a deprivation of therapeutic programming because there was repeatedly insufficient time to enroll. (Doc. 45) at ¶ 214 ("Mr. Encinias was frequently transferred to different prisons solely because of his mental disability in an attempt by each prison to rid itself of a complex medical patient."). Again, however, this is a conclusory claim without support of facts. The Court is aware of myriad reasons a prisoner may be moved between facilities, and nothing in the Second Amended Complaint supports the inference that intentionally depriving Mr. Encinias of medical care, as opposed to any other plausible reason, was the root cause. Based on these omissions, the Second Amended Complaint fails to state an essential element of an ADA and Rehabilitation Act claim.

## IV.   *Conclusion*

The Court concludes that Ms. Encinias states a facial constitutional violation against each individual Defendant, but that all are entitled to qualified immunity. The claims against them in

Count 1 are hereby dismissed with prejudice.[9]  The Court further concludes that Ms. Encinias

fails to state a claim under the ADA and Rehabilitation Act against NMDC.  Those claims in

Counts 3 and 4 brought against NMCD are hereby dismissed with prejudice.[10]  These holdings

encompass all the remaining claims against all the remaining Defendants.  The Court will

separately enter final judgment.

      IT IS SO ORDERED.

                                      _____
                                  UNITED STATES DISTRICT JUDGE

---

[9] If a court finds that a defendant is subject to qualified immunity, the court may dismiss with or without prejudice. *Breidenbach v. Bolish*, 126 F.3d 1288, 1294 (10th Cir. 1997); *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1342 (10th Cir. 2000).  In recognition that this is already Ms. Encinias' second amended complaint and that no further amendment to it is likely to clearly establish the law on point, the Court dismisses with prejudice.

[10] The Court has authority to dismiss with prejudice because under Rule 41(b), a 12(b)(6) dismissal "operates as an adjudication on the merits."  And "an adjudication on the merits" is synonymous with a dismissal with prejudice. *See Semtek International Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001).  That said, usually a dismissal is made with prejudice only when amending the complaint would be futile. *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1235 n.22 (10th Cir. 2021) (citing *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006)).  Here, Ms. Encinias is on her Second Amended Complaint.  The First Amended Complaint was already the subject of a motion to dismiss, (Doc. 30), which raised failure to state ADA and Rehabilitation Act claims as issues.  Ms. Encinias, in response, sought leave to amend precisely to "tailor her claims more narrowly and to more specifically inform the remaining Defendants of the bases of her claims." (Doc. 43) at 1–2.  In her Response to the instant Motion to Dismiss, Ms. Encinias argues incorrectly that "[a]t this early juncture, Plaintiff need not provide specific details concerning the Defendants' discriminatory motives." (Doc. 54) at 23.  Given her multiple insufficient attempts to state ADA and Rehabilitation Act claims, and her argument that she need not plead specific details at this juncture, the Court concludes any further opportunity to amend would be futile.